# EXHIBIT B

**SHOPPING CENTER LEASE**


**THE SOUTHBURY GREEN**

**SOUTHBURY, CT**



**LANDLORD**

**SOUTHBURY 84 ASSOCIATES LIMITED PARTNERSHIP**


**TENANT**

**THE GAP, INC.**

ARTICLE 1: PREMISES ............................................................................... ï
    1.1  Description of the Premises ..................................................... 1
    1.2  Condition of Premises ............................................................. 1

ARTICLE 2: CONSTRUCTION OF THE PREMISES ...................................... 1
    2.1  Construction Obligations ....................................................... 1
    2.2  Construction Plans ................................................................. 2
    2.3  Construction Approvals .......................................................... 2
    2.4  Conflicts ................................................................................. 3
    2.5  Punchlist Items ...................................................................... 3
    2.6  Signage and Storefront Rights ............................................... 3
    2.7  Satellite Dish ......................................................................... 3
    2.8  Hazardous Materials ............................................................. 4

ARTICLE 3: CONSTRUCTION ALLOWANCE ............................................... 5
    3.1  Construction Allowance ......................................................... 5
    3.2  Payment of Construction Allowance ...................................... 5

ARTICLE 4: COMMON AREA RIGHTS ....................................................... 5
    4.1  Common Easement ................................................................ 5
    4.2  No Build Area ........................................................................ 5
    4.3  Exterior of Premises .............................................................. 6

ARTICLE 5: TERM ................................................................................... 6
    5.1  Original Term ......................................................................... 6
    5.2  Lease Year Defined ................................................................ 6
    5.3  Automatic Extension of Original Term .................................... 6
    5.4  Delivery of Possession ........................................................... 7
    5.5  Dead Period ........................................................................... 7
    5.6  Upset Date ............................................................................. 8
    5.7  Options to Extend Term ......................................................... 8
    5.8  Tenant's Gross Sales Termination Right ................................. 8

ARTICLE 6: MINIMUM RENT .................................................................. 8
    6.1  Minimum Rent ....................................................................... 8
    6.2  Payment of Minimum Rent .................................................... 9

ARTICLE 7: GROSS SALES ...................................................................... 9
    7.1  Intentionally Deleted ............................................................. 9
    7.2  Intentionally Deleted ........................................................... 10
    7.3  Gross Sales ........................................................................... 10
    7.4  Intentionally Deleted ........................................................... 11
    7.5  Landlord's Audit .................................................................. 11

ARTICLE 8: OTHER CHARGES ............................................................... 11
    8.1  Other Charges ...................................................................... 11

ARTICLE 9: TAXES ................................................................................ 11
    9.1  Tenant's Obligation ............................................................. 11
    9.2  Tenant's Tax Share ............................................................... 12
    9.3  Taxes Payable Over Extended Periods .................................. 12
    9.4  Payment of Taxes ................................................................. 12
    9.5  Change of Ownership ........................................................... 12

10.3 CAM Costs ...................................................................................15
    10.4 Tenant's Proportionate Share ....................................................16
    10.5 Payment of CAM Charge .........................................................16
    10.6 Tenant's Audit ......................................................................16

*ARTICLE 11: UTILITIES* ...........................................................................17
    11.1 Utilities ...............................................................................17

*ARTICLE 12: USE*....................................................................................17
    12.1 Permitted Use ......................................................................17
    12.2 Restrictions..........................................................................17
    12.3 Days and Hours of Operation ..................................................17

ARTICLE 13: CO-TENANCY REQUIREMENTS.............................................18
    13.1 Initial Key Store Requirements ...............................................18
    13.2 Opening Requirements..........................................................18
    13.3 Operating Requirements .......................................................19
    13.4 Operating Requirement Remedies............................................20
    13.5 Substitution ........................................................................21

*ARTICLE 14: MAINTENANCE* ...................................................................21
    14.1 Landlord's Repairs ...............................................................21
    14.2 Tenant's Right to Cure ..........................................................21
    14.3 Entry by Landlord ................................................................22
    14.4 Tenant's Repairs ..................................................................23

*ARTICLE 15: COMPLIANCE WITH LEGAL REQUIREMENTS* ...........................23
    15.1 Compliance With Legal Requirements.......................................23

*ARTICLE 16: ALTERATIONS*.....................................................................23
    16.1 Alterations..........................................................................23
    16.2 Ownership and Surrender of Improvements...............................24
    16.3 Mechanic's Liens .................................................................24

*ARTICLE 17: INSURANCE*........................................................................24
    17.1 Landlord's Insurance ............................................................24
    17.2 Tenant's Insurance ...............................................................24
    17.3 Liability Insurance ...............................................................24
    17.4 Waiver of Subrogation ..........................................................25
    17.5 General Requirements ...........................................................25

*ARTICLE 18: INDEMNIFICATION* ............................................................. 25
    18.1 Indemnification....................................................................25

*ARTICLE 19: DAMAGE AND DESTRUCTION* ..............................................26
    19.1 Insurable Casualty................................................................26
    19.2 Uninsurable Casualty ...........................................................26
    19.3 Image or Destruction Prior to Delivery of Possession ..................27
    19.4 Delay in Rebuilding..............................................................27
    19.5 Rent Abatement ...................................................................27
    19.6 Termination.........................................................................27
    19.7 Proceeds ............................................................................27

20.3 Partial Taking .................................................................................................28
20.4 Restoration .....................................................................................................28
20.5 Award .............................................................................................................29

ARTICLE 21: ASSIGNMENT AND SUBLETTING ................................................29
21.1 Landlord's Consent .........................................................................................29
21.2 Permitted Transactions ...................................................................................29
21.3 Release of Liability .........................................................................................29

ARTICLE 22: DEFAULT............................................................................................30
22.1 Default by Tenant ...........................................................................................30
22.2 Remedies of Landlord .....................................................................................30
22.3 Default by Landlord ........................................................................................31

ARTICLE 23: SUBORDINATION .............................................................................31
23.1 Non-Disturbance Agreement from Present Encumbrance Holder.................31
23.2 Non-Disturbance Protection From Future Encumbrance Holder ..................32
23.3 Recognition of Subtenants ..............................................................................32

ARTICLE 24: ESTOPPEL CERTIFICATE .................................................................32
24.1 Estoppel Certificate ........................................................................................32

ARTICLE 25: RECORDING ......................................................................................33
25.1 Memorandum of Lease ....................................................................................33

ARTICLE 26: HOLDING OVER ...............................................................................33
26.1 Holding Over ..................................................................................................33

ARTICLE 27: MISCELLANEOUS .............................................................................33
27.1 Quiet Enjoyment ............................................................................................33
27.2 Ownership; Authority......................................................................................33
27.3 Rules and Regulations.....................................................................................33
27.4 Force Majeure .................................................................................................33
27.5 Brokers............................................................................................................33
27.6 Notices............................................................................................................34
27.7 Advertising and Trademarks ...........................................................................34
27.8 Year 2000 Compliance....................................................................................34
27.9 Successors and Assigns ...................................................................................35
27.10 Interpretation .................................................................................................35
27.11 Dispute Expenses............................................................................................35
27.12 List of Exhibits...............................................................................................35
27.13 Right of First Refusal......................................................................................35
27.14 Exculpation ....................................................................................................36

THIS LEASE is made and entered into this _12_ ' day of ___May___, 2000, by and between SOUTHBURY 84 ASSOCIATES LIMITED PARTNERSHIP a Massachusetts limited partnership ("Landlord"), and THE GAP, INC., a Delaware corporation ("Tenant").

In consideration of the mutual agreements hereinafter set forth, Landlord and Tenant agree as follows:

## ARTICLE 1: PREMISES

### 1.1    Description of the Premises

(A)     Landlord leases to Tenant and Tenant hires from Landlord that certain store premises (the "Premises") containing approximately 9,628 square feet of GLA (as defined below) and constituting a part of a retail shopping center commonly known as The Southbury Green (the "Shopping Center") located at 775 Main Street South, in the Town of Southbury, State of Connecticut (the "City"). All land comprising the Shopping Center is referred to as the "Property" and is legally described in **Exhibit A** attached hereto. All buildings and improvements situated on the Property may sometimes be collectively referred to as "Shopping Center Buildings" and are depicted on **Exhibit A-1** attached hereto. The Premises is part of that certain building, known as Building A, (the "Building") which constitutes one (or all) of the Shopping Center Buildings and is identified on Exhibit A-1.

(B)     Definition of GLA. The term "GLA" means the number of gross square feet of leasable floor area (whether occupied or unoccupied) on all levels of all Shopping Center Buildings intended for the exclusive use by an occupant thereof, including without limitation mezzanines and balconies (but excluding the management offices, maintenance storage areas, and community room, if any). The GLA of any premises (including the Premises) shall be measured from the exterior face of exterior walls and the exterior face of service corridor walls, the line along the front of the such premises where it abuts the sidewalk or other Common Area as may be shown on Exhibit A-1 (which line is commonly known as the "lease line"), and the center line of any wall that such premises shares with other leasable areas of the Shopping Center.

(C)     Height of Premises. The height of the Premises shall extend from the floor beneath the floor slab to the underside of the roof deck, or to the underside of the floor above if the Building is more than one (1) story in height.

### 1.2    Condition of Premises

The Premises shall be delivered to Tenant on the date of Delivery of Possession (as defined in Section 5.4) in a broom clean condition free of any personal property, signage or debris, and otherwise in a condition that is in compliance with Legal Requirements for retail property. If the Premises were previously occupied, any damage to the Premises occasioned by the removal of the previous occupant shall be repaired prior to Delivery of Possession, at Landlord's cost and expense. Landlord covenants that, upon Delivery of Possession, all of Landlord's Work (as defined in Section 2.1) shall be complete in all respects, subject only to punchlist items described in Section 2.5, and equipment, roof walkpads and utilities serving the Premises shall be installed and operating in good working order; all corrective work necessary to comply with the foregoing covenant shall be performed by Landlord at its cost and expense.

## ARTICLE 2: CONSTRUCTION OF THE PREMISES

### 2.1    Construction Obligations

(A)     Landlord and Tenant shall each construct portions of the Premises, at their respective cost and expense, in accordance with the provisions of this Article 2 and **Exhibit B** attached hereto. Exhibit B may be referred to herein as the Construction Exhibit. All work described in the Construction Exhibit for which Landlord is responsible, as well as all other work, if any, described in this Lease that is to be completed by Landlord prior to Delivery of Possession may be collectively referred to herein as "Landlord's Work," provided that Landlord's delivery of the rooftop air conditioning unit shall occur not later than three (3) weeks after Delivery of Possession.

(B)     All of Landlord's Work and Tenant's Work shall be done in a workmanlike manner and in accordance with Legal Requirements (as defined in Section 15.1). Tenant and the employees, agents, officers, directors, licensees, contractors, subcontractors, successors and assigns (collectively, "Agents") of Tenant shall not be required to post any type of security or performance bond or other security in connection with Tenant's Work or any Alterations (as defined in Section 16.1) by Tenant. Tenant and Tenant's Agents shall not be required to pay or reimburse Landlord for any backcharges, fees, expenses or other costs in connection with Tenant's Work or any Alterations, except as specifically provided in this Lease or the Construction Exhibit. Tenant's Work shall be performed by Tenant at Tenant's own cost and expense. Landlord shall have no responsibility to Tenant or to any contractor, subcontractor, supplier, materialman, workman, or other person, firm, or corporation who shall engage or participate in any Tenant's Work. Landlord's Work shall be performed by Landlord at Landlord's own cost and expense. Tenant shall have no responsibility to Landlord or to any contractor, subcontractor, supplier, materialman, workman, or other person, firm, or corporation who shall engage or participate in any Landlord's Work.

## 2.2     Construction Plans

(A)     Tenant Plans. On December 10, 1999, Tenant submitted to Landlord a complete set of Tenant's plans and specifications for Tenant's Work. On March 16, 2000, Tenant submitted to the City a complete set of final plans for Tenant's Work which Landlord had previously fully approved. Said plans shall be referred to herein as the "Approved Tenant Plans." The Approved Tenant Plans shall not be modified or amended without the prior written consent of Landlord and Tenant.

## 2.3     Construction Approvals

(A)     Tenant expressly acknowledges that Tenant's ability to design and construct the Premises (including without limitation, the number, design and construction of Tenant's signs and storefront) in accordance with its requirements are material inducement to Tenant to enter into this Lease. However, **Tenant has received all Approvals.**

(B)     The term "Approvals" means any and all approvals, permits and variances required for the Development Plans and the construction of the Premises in accordance with the Development Plans from Landlord and all governmental or quasi-governmental authorities and third parties (whether private or public) having authority pursuant to law or otherwise to review and/or approve the design and/or construction of the Premises.

(C)     The term "Development Plans" means all plans and specifications (whether prepared by Tenant or Landlord or otherwise and whether for work to be performed by Tenant or Landlord or otherwise) approved by Tenant for: (1) Tenant's storefront, including, without limitation, the size, configuration, location, color, and other aesthetic features of the storefront; and (2) Tenant's exterior signs, including, without limitation, the size, configuration, location, color, and other aesthetic features of such signs, as well as the number and content of such signs; and (3) the interior and exterior appearance of the Premises. Tenant acknowledges that Tenant's exterior signs shall be placed on the front of the Premises. Tenant shall continue to obtain approvals to install blade signs along the front of the Premises as set forth in the Approved Tenant Plans, except that the letter size shall be reduced so as to comply with the requirements of the Town of Southbury. No signs may be placed on any surface of any building other than the front of the Premises.

(D)     The Development Plans shall be in accordance with Tenant's requirements as Tenant, in its sole discretion, may determine, regardless of whether such requirements are permitted under Legal Requirements or whether a variance is required. Tenant shall not be required to accept or comply with any condition of approval imposed or requested which Tenant does not, in the exercise of its sole discretion, deem acceptable. Tenant's obligation to obtain the Approvals shall not extend beyond the determination of the applicable governmental authority at a formal public hearing for the same, and Tenant shall have no obligation to appeal an adverse decision. Landlord and Tenant shall cooperate with each other in their application for third party approval of the Development Plans and will execute any required documents in connection therewith and, if

(E)  For purposes of this Section 2.3, the Development Plans shall not be considered approved if the Development Plans (1) are marked "disapproved" or "approved as noted," or (2) contain any conditions, notations or requirements, or (3) the approving party fails to take any action legally required for approval.

## 2.4    Conflicts

Nothing shall be binding as between Landlord and Tenant except to the extent set forth in this Lease or as otherwise agreed in writing by Landlord and Tenant.  In the event of a conflict or inconsistency between (a) this Lease (other than the Construction Exhibit), (b) the Construction Exhibit, (c) the Approved Tenant Plans, or (d) the Rules, the following order of priority shall be determinative in resolving such conflicts or inconsistencies among the various documents:

(1)    this Lease (other than the Construction Exhibit)
(2)    the Approved Tenant Plans
(3)    the Construction Exhibit
(4)    the Rules

## 2.5    Punchlist Items

All punchlist items relating to Landlord's Work that would delay the commencement or completion of Tenant's Work shall be completed by Landlord prior to Delivery of Possession. Landlord shall complete any other punchlist items as soon as reasonably possible (but in any event no later than fourteen (14) days) after receipt of a written punchlist.  If any such punchlist items must be completed after commencement by Tenant of Tenant's Work, Landlord shall coordinate with Tenant's contractor to ensure timely completion of the punchlist items and so as to minimize any disruption in Tenant's construction schedule.  If Landlord fails to complete any punchlist items within fourteen (14) days after receipt of a written punchlist, then Tenant shall have the right, but not the obligation, to complete any such punchlist items and deduct the cost thereof from the Rent next coming due,, in addition to any other remedies Tenant may have.

## 2.6    Signage and Storefront Rights

Tenant shall have the right to install the maximum signage allowed by Legal Requirements and approved by Landlord on the Premises.  In addition, in the event a Shopping Center pylon sign is constructed and/or any tenant is permitted to place its sign on the Shopping Center pylon sign, Tenant shall have the right to install an identification panel on each side of the pylon sign located at Southbury Green.  Tenant's panels shall be equal to or larger than all other panels on such sign and shall be located the top one-third of such sign. Tenant shall have no obligation to pay for the construction of such sign.

## 2.7    Satellite Dish

To the extent permitted by applicable law, Tenant shall have the right to install or cause to be installed a satellite communications dish ("Dish") on the roof of the Premises or the Building in order to link the Premises to Tenant's chain-wide communications network.  There shall be no additional charge payable by Tenant to Landlord for the use of such roof area or for the installation of the Dish.  Tenant's vendor, as the designee of Tenant, shall have the right to install the Dish and such vendor shall indemnify Landlord and be solely responsible, at such vendor's cost and expense, for the proper installation, maintenance and repair of the Dish, and for any damage to the roof or building caused thereby, and any injury or damage to persons or property caused by such satellite dish and Landlord shall have no responsibility with respect thereto unless the same was made necessary by the negligence or willful act of Landlord or Landlord's Agents.

## 2.8    Hazardous Materials

(A)    Landlord's Representation and Covenant.

(1)    Landlord warrants and represents that it has not used, and covenants that it shall not use, any Hazardous Materials (as defined below) in the Premises (including the

(2)     The term "Hazardous Materials" means asbestos and asbestos-containing material (regardless of its condition); any chemical, material or substance at any time defined as or included in the definition of "hazardous substances", "hazardous wastes", hazardous materials", "extremely hazardous waste", "biohazardous waste", "pollutant", "toxic pollutant", "contaminant", "restricted hazardous waste", "acutely hazardous waste", "radioactive waste", "infectious waste", "toxic substances", or any other term or expression intended to define, list or classify substances by reason of properties harmful to health, safety or the indoor or outdoor environment (including harmful properties such as ignitability, corrosivity, reactivity, carcinogenicity, toxicity or words of similar import) under any Legal Requirement); any oil, petroleum, petroleum fraction or petroleum derived substance; urea formaldehyde foam insulation; electrical equipment which contains any oil or dielectric fluid containing polychlorinated biphenyls.

(3)     The term "Support Systems" means any utility system or other facility which serves the Premises, whether located in the Premises or in other portions of the Property.

(B)     Obligation Prior to Delivery of Possession.  If Hazardous Materials are discovered in the Premises or Support Systems (without regard to whether Landlord caused such Hazardous Materials to be installed therein) prior to Delivery of Possession, then Landlord, at its sole cost and expense, shall remove the Hazardous Materials and deliver to Tenant a clearance certificate from the applicable governmental jurisdiction (or, if no governmental jurisdiction issues such certificate, then from a licensed environmental hygienist) certifying as to the complete removal thereof (collectively, "Abatement Work") promptly but in any event prior to Delivery of Possession.

(C)     Obligation After Delivery of Possession.  If Hazardous Materials are discovered in the Premises or Support Systems after Delivery of Possession but prior to the Commencement Date (as defined in Section 5.1), then Tenant shall have the right to cease all work therein and to remove itself from the Premises and Landlord shall, at its sole cost and expense, promptly perform all Abatement Work and repair or replace all improvements damaged by the Abatement Work. The Construction Period (as defined in Section 5.1) shall be tolled and the Commencement Date and Tenant's obligation to pay Rent (as defined in Section 8.1) shall be postponed from the date on which the Hazardous Materials are discovered until the date on which the Abatement Work is complete and all damaged improvements are repaired or replaced.

(D)     Obligation After Commencement Date.  If Hazardous Materials are discovered in the Premises or Support Systems but not the parking lot outside of the No Build Area on or after the Commencement Date, then Tenant shall have the right to vacate the Premises and Landlord shall, at its sole cost and expense, promptly perform all Abatement Work and repair or replace all improvements damaged by the Abatement Work. All Rent shall totally abate from the date on which the Hazardous Materials are discovered until the date on which the Abatement Work is complete and all damaged improvements are repaired or replaced.

(E)     Tenant's Covenant.  Tenant hereby covenants and agrees that is shall not use or release any Hazardous Materials in completing Tenant's Work or in its operations within the Premises or the Support Systems or any portion of the Property or Shopping Center.  In the event that Tenant, or those acting by or through Tenant or on Tenant's behalf, violate such covenant, then Tenant shall, at its sole cost and expense, promptly perform all Abatement Work necessary to remove such Hazardous Materials from the Premises, Support Systems, Property or Shopping Center, as applicable, and shall repair or replace all improvements damaged in the course of such Abatement Work.

(F)     Tenant's Indemnification.  Tenant shall indemnity, defend and hold Landlord harmless from and against any and all Indemnified Costs (as defined in Section 18.1) relating to any Hazardous Materials in the Premises, Support Systems, Property and any Abatement Work, in the event that such Hazardous Materials were installed, used or released therein by Tenant or Tenant's agents, or those acting by, through or on behalf of Tenant.  Tenant shall be solely responsible for and shall comply with all Legal Requirements with respect to Hazardous Materials on the Property or Shopping Center if such Hazardous Materials were installed, used or released thereon by Tenant, Tenant's agents, or those acting by or through Tenant.

any Hazardous Materials in the Premises or Support Systems and any Abatement Work, provided that such Hazardous Materials were not installed therein by Tenant or Tenant's Agents. Landlord shall be solely responsible for and shall comply with all Legal Requirements with respect to Hazardous Materials on the Property, provided that such Hazardous Materials were not installed thereon by Tenant or Tenant's Agents.

## ARTICLE 3: CONSTRUCTION ALLOWANCE

### 3.1 Construction Allowance

In consideration for the performance by Tenant of certain work in the Premises, Landlord shall pay to Tenant an allowance (the "Construction Allowance") in an amount equal to Three Hundred Thirty-Six Thousand Dollars ($336,980.00) payable in accordance with Section 3.2. The Construction Allowance amount has been computed at the rate of Thirty-Five Dollars ($35.00) per square foot of GLA of the Premises and on the basis that the GLA of the Premises is 9,628 square feet. If the GLA of the Premises is determined by certification of Tenant's architect to be different, the Construction Allowance shall be recomputed on the basis of the adjusted GLA.

### 3.2 Payment of Construction Allowance

Said Construction Allowance, shall be paid to Tenant in the form of a full rent abatement of the next ensuing payments of Minimum Rent and Other Charges becoming due on and after the Commencement Date until the Construction Allowance is fully paid to Tenant. Within thirty (30) days after the Commencement Date, Tenant shall submit to Landlord a lien waiver and release from Tenant's General Contractor.

## ARTICLE 4: COMMON AREA RIGHTS

### 4.1 Common Easement

Tenant and Tenant's Agents, customers and invitees shall have all rights appurtenant to the Premises and a non-exclusive, irrevocable easement and right, in common with the other occupants of the Shopping Center and with the public, for the purpose of access over and across as well as the use of all areas for the common use of the occupants of the Shopping Center, including, without limitation, the sidewalks, driveways and parking areas on the Property (collectively, the "Common Areas"), which easement shall be appurtenant to the Premises and shall run with the land during the term of this Lease.

### 4.2 No Build Area

(A) Landlord covenants that, within the area identified as the "No Build Area" on **Exhibit A-1,** (a) there shall be no kiosk, pushcart, mobile retail unit or other obstruction other than those shown on the site plan attached as Exhibit A-1 (whether temporary or permanent) at any time commencing upon Delivery of Possession until the expiration or early termination of this Lease, (b) the traffic pattern will not be modified at any time until the expiration or early termination of this Lease and (c) the number of parking spaces and entrances will not be reduced at any time until the expiration or early termination of this Lease. However, the following items shall be permitted within the No Build Area, provided that such items are at least twenty (20) feet from Tenant's proposed entrance(s) to the Premises: (1) seats and benches, and (2) new landscaping that at maturity will not exceed four (4) feet in height.

(B) If Landlord violates its covenant with respect to the No Build Area described in Section 4.2(A) and fails to cure such violation within ten (10) days of receipt of written notice by Tenant to Landlord of a violation of the foregoing, Tenant shall have the right to deduct from Rent Two Thousand Dollars ($2,000.00) per day for each day of such violation, in addition to Tenant's right seek other remedies, including specific performance.

(C) With respect to the remainder of the Common Area outside of the No Build Area, Landlord shall not decrease the number of parking spaces below the number legally required, reduce in size or eliminate any driveways, or do any act which will materially interfere with access

Except when necessary to perform repair work as required by Section 14.1, Landlord shall not, nor suffer or permit others at any time during the Term (as defined in Section 5.1) to (a) make or erect any alterations or additions to the exterior of the Premises, or (b) if any portion of the Premises is directly under the roof of the Building, affix, erect or install thereon any other structure or object of any kind on the roof above the Premises. Any of the foregoing shall be subject to the prior written consent of Tenant, which consent may be withheld by Tenant in its sole and absolute discretion.

## *ARTICLE 5:  TERM*

### 5.1    Original Term

(A)    The "Original Term" of this Lease shall be for a period of ten (10) Lease Years (as defined below). References to "Term" in this Lease shall be deemed, unless the context otherwise requires, to include the Original Term and any extensions or renewals of this Lease that have been exercised or otherwise agreed upon in writing by Tenant.

(B)    The Term and Tenant's obligation to pay Rent shall commence (the "Commencement Date") upon the earlier to occur of:  (1) the date next following the expiration of one hundred twenty (120) days (the "Construction Period") after Delivery of Possession; or (2) the date Tenant opens the Premises for business.

(C)    Once the Commencement Date has been determined in accordance with this Lease, within twenty (20) days after written request by either party, Landlord and Tenant shall mutually execute and deliver a date confirmation agreement confirming the Commencement Date, but either party's failure to execute such agreement or to request such agreement shall not affect the Commencement Date.

### 5.2    Lease Year Defined

The first "Lease Year" shall begin on the Commencement Date and shall expire on the last day of the month, twelve (12) full calendar months next following the Commencement Date. If the Commencement Date occurs on the first day of the calendar month, then the first Lease Year shall end on the day immediately preceding the first anniversary of the Commencement Date. Subsequent Lease Years shall be each consecutive twelve (12) calendar month period thereafter. The last day of the last full Lease Year of the Term is referred to as the "Natural Expiration Date."

### 5.3    Automatic Extension of Original Term

(A)    If the Natural Expiration Date would occur during the period between August 1 and December 31 of a given year and Tenant does not elect to exercise any option to extend the Original Term, then the Original Term shall be deemed automatically extended until the next succeeding January 31st (which later expiration date is referred to herein as the "Extended Expiration Date").  During such extension period, Tenant shall pay, as monthly Minimum Rent (as defined in Section 6.1) and Other Charges (as defined in Section 8.1), the monthly amounts paid by Tenant during the last month prior to the extension period.

(B)    If the Natural Expiration Date would occur during the period between August 1 and December 31 of a given year and Tenant elects to exercise any option to extend the Original Term, then the term of such Option Period shall commence on the day following the Natural Expiration Date.  The term of the last Option Period exercised by Tenant (and the Term of this Lease) shall be deemed automatically extended until the next succeeding January 31st (which later expiration date is referred to herein as the "Extended Expiration Date").  During such extension period, Tenant shall pay, as monthly Minimum Rent and Other Charges, the monthly amounts paid by Tenant during the last month prior to the extension period.

obligation to pay Rent shall commence, Landlord's delivery of possession of the Premises to Tenant ("Delivery of Possession") shall not be deemed to have occurred, nor shall the Construction Period commence to run, unless and until all of the following conditions have been satisfied or waived by Tenant in writing:

(1)     Physical possession of the Premises has been delivered to Tenant with all of Landlord's Work complete in all respects, subject only to punchlist items described in Section 2.5 and provided that Landlord's delivery of the rooftop air conditioning unit shall occur not later than three (3) weeks after Tenant commences construction of its improvements.

(2)     Except for the blade signs, all Approvals have been obtained.

(3)     Landlord has delivered to Tenant a duly-executed Non-Disturbance Agreement (as defined in Section 23.1) from each holder of an Encumbrance (as defined in Section 23.1) existing as of the date all other Delivery of Possession requirements have been satisfied.

(4)     Landlord has completed all Abatement Work (including, without limitation, delivery to Tenant of a clearance certificate), if Hazardous Materials have been discovered in the Premises or Support Systems.

(5)     Landlord has removed all kiosks, pushcarts, mobile retail units and other obstructions, other than those shown on the site plan attached as Exhibit A-1 (whether temporary or permanent) within the No Build Area (as defined in Section 4.2), except as described in Section 4.2.

(6)     The Common Areas of the Shopping Center, including the parking lot and all driveways serving the Shopping Center) as shown on site plan attached as Exhibit A-1 are completed (including, without limitation, grading, surfacing, striping and landscaping), and all parking lot lighting is installed and operational.

(7)     The Initial Key Store Requirements (as defined in Section 13.1) have been satisfied.

(8)     Landlord delivered to Tenant a copy of the most recent construction schedule for its work on the Premises, the Shopping Center and all premises therein.

(B)     Landlord anticipates that Delivery of Possession shall occur on May 15, 2000 (the "Anticipated Delivery Date"). Notwithstanding that the Delivery of Possession requirements may have been met, Delivery of Possession shall not be deemed to occur and the Construction Period shall not commence to run prior to the Anticipated Delivery Date, unless Tenant in its sole discretion elects to accept such early possession.

## 5.5    Dead Period

(A)     If Delivery of Possession occurs on a date which will result in the expiration of the Construction Period occurring during a Dead Period (as defined below), or Tenant has not opened the Premises for business due to a failure of Landlord to satisfy the Opening Requirements (as defined in Section 13.2), and subsequently the Opening Requirements are satisfied during a Dead Period, then, unless Tenant elects to open for business sooner, Tenant shall not be required to open, nor shall the Commencement Date occur or the obligation to pay Rent begin, until the day next following the applicable Dead Period.

(B)     The term "Dead Period" means any of the following periods: October 1 through February 2.

## 5.6    Upset Date

(A)     Except as a result of delays caused solely by Tenant, if Landlord has not (1) satisfied the Delivery of Possession requirements (other than the requirements set forth in Subsection 5.4(A)(2) to be performed by parties other than/ Landlord or Landlord's Agents) by the

equal to an amount equal to three (3) days of Minimum Rent (e.g., $1,600.00) for each day Delivery of Possession or completion of the punchlist items is so delayed (the "Late Delivery Fee"). If Landlord fails to pay any portion of the Late Delivery Fee within ten (10) days after demand therefor, then in addition to all other rights and remedies that Tenant may have against Landlord (but without duplication in recovering the amounts due Tenant), Tenant shall be entitled to deduct the unpaid and overdue portion of the Late Delivery Fee from the Rent otherwise becoming due hereunder, together with interest on the unpaid balance thereof at the prime rate per annum of Wells Fargo Bank of San Francisco for short term commercial loans plus four percent (4%). The parties agree that Tenant's actual damages as a result of Landlord's late delivery would be extremely difficult or impracticable to determine, and acknowledge that the Late Delivery Fee has been agreed upon, after negotiation, as the parties' best and reasonable estimate of Tenant's damages.

(B)     If Landlord has not satisfied the Delivery of Possession requirements (other than the requirements set forth in Subsection 5.4(A)(2) to be performed by parties other than Landlord or Landlord's Agents) within three (3) months after the Anticipated Delivery Date, then, in addition to Tenant's right to receive payment of the Late Delivery Fee, Tenant shall have the continuing right at any time thereafter and prior to the fulfillment of such conditions to terminate this Lease on five (5) days' written notice thereof to Landlord. Upon such termination, this Lease shall be of no further force or effect (except that Tenant shall have the right to receive payment of the Late Delivery Fee for each day through the date of termination).

## 5.7     Options to Extend Term

Tenant shall have the option to extend the Term for two (2) additional periods of five (5) Lease Years each (individually an "Option Period") upon the same terms and conditions as are provided for the Original Term, except that Minimum Rent shall be as provided in Section 6.1. To exercise such option, Tenant must give Landlord written notice thereof at least six (6) months prior to the Natural Expiration Date.

## 5.8     Tenant's Gross Sales Termination Right

Tenant may terminate this Lease for a fee of One Hundred Fifty Thousand and 00/100 Dollars ($150,000.00) if Tenant's Gross Sales for the period commencing with the beginning of the 55th full calendar month and ending upon the expiration of the 66th full calendar month of the Term do not equal or exceed the amount of Four Million Dollars ($4,000,000.00), Tenant may, at any time during the 67th through the 69th full calendar months of the Term, terminate this Lease by giving notice thereof to Landlord, which termination shall be effective as of a date which shall be specified in Tenant's notice of termination, provided that such date shall be no less than thirty (30) days following receipt by Landlord of such notice. Prior to the effective date of termination Tenant shall pay any past due Rent other than any amount Tenant is withholding, pursuant to a dispute or otherwise pursuant to this Lease.

### *ARTICLE 6: MINIMUM RENT*

## 6.1     Minimum Rent

(A)     Subject to Section 3.2 with respect to offsets against Minimum Rent for the Tenant Construction Allowance, Tenant shall pay to Landlord, at Landlord's notice address or such other place designated by Landlord in writing, without prior demand therefor, minimum rent (the "Minimum Rent") in the amounts set forth in the following schedule.

(1)     From the Commencement Date through the end of the 10th Lease Year (the "Base Period"), Annual Minimum Rent shall be One Hundred Ninety-two Thousand Dollars ($192,560) (calculated at the rate of $20.00 per square foot of the Premises), payable in twelve equal monthly installments of Sixteen Thousand and 00/100 Dollars ($16,046.67) each.

(2)     If the first option to extend is exercised, from the 11th Lease Year through the end of the 15th Lease Year (the "First Adjustment Period"), Annual Minimum Rent shall be increased by the lesser of (i) ten percent (10%) or (ii) the sum of (a) aggregate percentage change in the CPI (as defined below) from the sixty first (61st) full calendar month of the Base Period through the last

(3)     If the second option to extend is exercised, from the 16th Lease Year through the end of the 20th Lease Year (i.e., the Natural Expiration Date or Extended Expiration Date, as applicable) (the "Second Adjustment Period"), Annual Minimum Rent shall be increased by the lesser of (i) ten percent (10%) or (ii) the sum of (a) the aggregate percentage change in CPI (as defined below) from the first full calendar month of the First Adjustment Period through the last full calendar month of the First Adjustment Period, plus (b) two percent (2%), but in no event shall Annual Minimum Rent for the Second Adjustment Period be less than Annual Minimum Rent for the First Adjustment Period.

(B)     Minimum Rent amounts stated above were computed at the annual rates per square foot stated above on the basis of a GLA of 9,628 square feet for the Premises. In the event that the GLA of the Premises is determined by certification of Tenant's architect to be different, Minimum Rent stated above (and all other amounts expressly calculated herein on a per-square-foot basis) shall be recomputed on the basis of the actual GLA as so certified.

(C)     CPI Defined. The term "CPI" means the Consumer's Price Index - U.S. City Average For All Items For All Urban Consumers (1982-84 = 100) published monthly by the United States Department of Labor, Bureau of Labor Statistics. If the Bureau of Labor Statistics changes the base period for computing the CPI or otherwise revises the manner in which the CPI is determined, an adjustment shall be made in the revised index which would produce results equivalent, as nearly as possible, to those which would be obtained hereunder if the CPI were not so revised. If the CPI becomes unavailable because publication is discontinued or otherwise, there shall be substituted therefor a comparable index, reasonably acceptable to both parties, based upon changes in the cost of living or the purchasing power of the consumer dollar, published by an agency of the federal government or in the absence thereof, by a nationally recognized financial reporting service.

## 6.2     Payment of Minimum Rent

Minimum Rent shall accrue commencing on the Commencement Date and shall be payable in equal monthly installments in advance on the first day of each calendar month during the Term, except that Tenant's first installment of Minimum Rent shall not be due until ten (10) days after the later to occur of (i) the Commencement Date or (ii) Tenant's receipt of: (a) an invoice for such first installment, (b) a legible map of the Tax Parcel (as defined in Section 9.1), and (c) a notice certifying the tradename and GLA of each tenant of the Shopping Center as of the Commencement Date. Minimum Rent for any partial calendar month during the Term shall be prorated based on a 365-day calendar year (calculated by multiplying the number of days in such partial calendar month by a fraction, the numerator of which is the applicable Annual Minimum Rent and the denominator of which is 365). With respect to the Minimum Rent adjustments described in Section 6.1, Tenant shall continue to pay the Minimum Rent payable for the month prior to the date of the Minimum Rent adjustment until the amount of the adjustment has been determined. Promptly after the publication of the applicable CPI, Landlord shall notify Tenant in writing of the adjusted Minimum Rent (adjusted in accordance with Section 6.1). Within thirty (30) days after Tenant's receipt of Landlord's Minimum Rent adjustment notice, any overpayment of Minimum Rent shall be paid by Landlord to Tenant and any underpayment of Minimum Rent shall be paid by Tenant to Landlord, subject to Tenant's right to verify the adjustment.

## ARTICLE 7: GROSS SALES

## 7.1     Intentionally Deleted.

## 7.2     Intentionally Deleted.

## 7.3     Gross Sales

(A)     Gross Sales Defined. The term "Gross Sales" means the gross amount received by Tenant (including for this purpose only the amount received from any Concessionaire (as defined in Section 21.2) from all sales, both for cash and on credit, made or rendered in, upon or from the Premises (and in cases of sales on credit whether or not payment be actually made therefor) and

(1)     amounts received with respect to any sale to the extent of the net amount of any refund made or credit allowed upon any such sale, where the merchandise sold, or some part thereof, is returned to and accepted by Tenant;

(2)     exchanges or transfers of merchandise between other stores of Tenant where such exchanges are made solely for the convenient operation of Tenant's business and not for the purpose of consummating a sale which has been made at, in, upon or from the Premises;

(3)     returns to suppliers or manufacturers;

(4)     the amount of any city, county, state or federal sales, use, luxury or excise tax on such sales which is both added to the selling price (or absorbed therein) and paid to the taxing authorities by Tenant;

(5)     any penalty charged by Tenant for a returned check;

(6)     reimbursement of amounts for postage, express or delivery services, including, but not limited to, United Parcel Service, incurred in delivering merchandise to customers, provided that such charges are at all times properly segregated from amounts includable in Gross Sales and so identified on Tenant's records;

(7)     any sale at a discount to a bona fide employee of Tenant or a Concessionaire, to the extent that such sales do not exceed three percent (3%) of the total Gross Sales in any Lease Year;

(8)     receipts from vending machines and coin-operated games from which revenues are donated to charitable organizations or which are not available for use by the public and receipts from pay telephones;

(9)     any charge added by Tenant to its regular cash price as a finance charge for sales on credit, provided that such charge is at all times properly segregated from amounts includable in Gross Sales and so identified on Tenant's records; each transaction involving the extension of credit shall be treated as a sale for the regular cash price in the month in which such transaction occurred, without regard to the time payment is made or title passes;

(10)     any charges paid to the issuers of credit cards and for check authorization fees;

(11)     any sale of fixtures or equipment not in the regular course of Tenant's business or after use thereof;

(12)     gift certificates, or like vouchers, until such time as the same have been converted into a sale by redemption at the Premises;

(13)     internet or catalog sales, where the payment for the item purchased is not made through the cash register system at the Premises;

(14)     layaway sales until the merchandise is delivered to the customer at the Premises;

(15)     the amount of any special discount to customers for damaged or defective merchandise;

(16)     bad debt expense with respect to merchandise sold on credit or purchased by check; and

(17)     charges collected from customers for fittings and alterations.

(B)     Reporting.  Tenant shall submit, within thirty (30) days after the end of each of Tenant's fiscal months during the Term, a written statement showing the amount of Gross Sales

**7.4    Intentionally Deleted. .**

**7.5    Landlord's Audit**

Tenant shall, for a period of two (2) years after the end of each Lease Year, keep safe and intact at Tenant's principal offices all of the records, books, accounts and other data which are regularly kept by Tenant in the ordinary course of its business to establish Tenant's Gross Sales, in upon and from the Premises. Landlord may cause, once per Lease Year, at any time during normal business hours and upon reasonable prior notice to Tenant, an audit to be made at Tenant's main accounting office of records required to be kept hereunder relating to the Premises for the period covered by any annual statement of Gross Sales furnished by Tenant as above set forth. Any information obtained as a result of such audit shall be held in strict confidence.

### ARTICLE 8:  OTHER CHARGES

**8.1    Other Charges**

Subject to Section 3.2 with respect to the Construction Allowance offset, all payments and charges, if any, to be made hereunder by Tenant other than Minimum Rent shall be deemed to be "Other Charges." Unless the context requires otherwise, Other Charges for any partial calendar month during the Term shall be prorated based on a 365-day calendar year. Subject to Section 3.2 with respect to the Construction Allowance offset, Landlord shall have the same rights and remedies hereunder with respect to the collection of Other Charges as it has with respect to the collection of Minimum Rent. Minimum Rent, Interim Rent (if applicable), Alternate Rent (if applicable), and Other Charges may sometimes be collectively referred to as "Rent."

### ARTICLE 9:  TAXES

**9.1    Tenant's Obligation**

(A)    Subject to other provisions of this Article 9, Tenant shall pay to Landlord Tenant's Tax Share (as defined below) of Taxes (as defined below) during the Term with respect to the Tax Parcel, which payment by Tenant is referred to herein as the "Tax Payment". Except for the Tax Payment, Tenant shall have no obligation to pay Taxes with respect to the Shopping Center (other than Taxes with respect to Tenant's personal property).

(B)    Taxes Defined. The term "Taxes" means the ad valorem real estate taxes and Special Assessments (as defined below) levied or assessed upon the Tax Parcel. Subject to other provisions of this Article 9, Taxes shall include assessments ("Special Assessments") included in Landlord's real estate tax bill which are imposed by a governmental authority against the Tax Parcel for off-site highway improvements or off-site utility improvements constructed by a governmental authority and directly benefiting or serving the Tax Parcel, provided that such assessments do not include any costs (including financing costs), whether incurred by Landlord or any governmental authority, in connection with any capital improvements on any part of the Property or Tax Parcel, the net effect of which is to fund or finance construction or other projects on behalf of Landlord, regardless of the designation of such costs as an "assessment" or "special assessment" and regardless of whether such costs were incurred or financed pursuant to public improvement bond financing, development bond financing, a special assessment district or other program authorized by Legal Requirements or otherwise. Taxes shall not include penalties, interest, income taxes, profit taxes, business taxes, gross receipts taxes, capital levy taxes, inheritance taxes, estate taxes, succession taxes, transfer taxes, gift taxes, franchise taxes, corporation taxes, documentary stamp taxes, mortgage lien taxes, transfer gains taxes or recording fees.

(C)    Tax Parcel Defined. The term "Tax Parcel" means the single tax or assessment parcel owned or controlled by Landlord which includes the Premises. Landlord shall deliver to Tenant, upon Tenant's request from time to time, a legible map of the Tax Parcel.

**9.2    Tenant's Tax Share**

The term "Tenant's Tax Share" means that amount, expressed as a percentage which is represented as a fraction, the numerator of which is the GLA of the Premises and the denominator of which is the GLA of all improvements on the Tax Parcel, as such GLA may be changed from time to time. Any change in Tenant's Tax Share shall be effective as of the first day of the calendar month next following any change in the GLA of either the numerator or denominator of such fraction. As of the date hereof, Tenant's Tax Share is 6.64% (9,628 square feet/145,000 square feet). Landlord's estimate of Tenant's Tax Payment for the first Lease Year is Two and 15/100 Dollars ($2.15) per square foot of GLA of the Premises per annum.

**9.3    Taxes Payable Over Extended Periods**

If Taxes may, at the option of the taxpayer, be paid in installments over a period longer than one (1) year, then the same shall be deemed paid in installments over the maximum period permitted by the taxing authority and Tenant's obligation to make its Tax Payment for any one (1) Tax Year shall only apply to those installments which become actually due and payable (i.e., failing which payment the same would become delinquent), together with the interest charged thereon by the governmental authority, during that same Tax Year.

**9.4    Payment of Taxes**

Landlord shall render to Tenant, promptly after the receipt of the tax bill applicable to the Tax Parcel for a given Tax Year, a legible copy of such tax bill and a statement showing the amount of Taxes and indicating in reasonable detail the items included in Taxes and the computation of the Tax Payment. Tenant shall pay its Tax Payment by the later to occur of thirty (30) days after Tenant's receipt thereof or thirty (30) days prior to the date on which such tax bill will be delinquent; it being understood, however, that Tenant's obligation for the payment of any Taxes during each Lease Year shall apply only to Taxes which are allocable to the Tax Year then in progress (plus any previously accrued Taxes which Tenant has not yet paid) and Tenant shall not be obligated to make any prepayment of Taxes for Tax Years not yet in progress unless the taxing authority has billed Landlord for the same. If the actual Taxes for the then current Tax Year are not yet known, Landlord may estimate such Taxes based on reasonably anticipated increases, provided however that in no event may such estimate exceed 110% of the prior year's actual Taxes. When the actual Taxes become known, Tenant's estimated payments shall be readjusted as the case may require. Overpayments by Tenant of Taxes shall be promptly refunded. Taxes for any fraction of a Tax Year at the commencement or expiration of the Term shall be apportioned pro rata between the parties, with Tenant responsible only for that portion of Taxes applicable to the Term.

**9.5    Change of Ownership**

If the laws and regulations of the State of Connecticut are changed to limit taxes in a manner similar to State of California Proposition No. 13 (as more fully described below) so that a change of ownership (as defined by Legal Requirements) of the Tax Parcel results in an increase in the assessed valuation of the Tax Parcel (the "Change of Ownership Assessment"), then Tenant shall not be liable for any Taxes attributable to the Change of Ownership Assessment; and for purposes of computing Tenant's Tax Payment commencing with the Tax Year in which the Change of Ownership Assessment is first reflected in the taxing authorities' notice of assessment and continuing for all subsequent Tax Years, the Taxes attributable to such change of ownership shall be subtracted from Taxes. For purposes of this Section 9.5, the relevant concepts of State of California Proposition No. 13 are that: (a) the assessed value of property is capped (and therefor real property taxes are capped), and (b) upon a change of ownership (other than certain inter-family transfers), the value of property is reassessed to the actual market value of the property notwithstanding the cap.

**9.6    Tenant's Right to Contest**

Tenant shall have the right to contest the amount or validity of any Taxes or to seek a reduction in the valuation of the Premises or the Tax Parcel and to prosecute any proceedings to that end and shall give written notice thereof to Landlord. Tenant may postpone or defer payment

of Landlord in which event Landlord shall join in such proceedings or permit the same to be brought in its name. Tenant shall indemnify and save harmless Landlord from any costs and expenses in connection with such proceedings. Tenant shall be entitled to a refund of any Taxes (and penalties or interest thereon) received by Landlord which have been paid by Tenant, or which have been paid by Landlord but previously reimbursed in full by Tenant.

## ARTICLE 10: COMMON AREA MAINTENANCE COSTS

### 10.1 Common Area Maintenance

Landlord shall cause to be maintained the Common Areas of the Shopping Center and shall preserve the same in good order, repair and operable condition, consistent with standards of good shopping center property management, including, without limitation, cleaning; garbage collection; snow removal; operating and maintaining all lighting, loudspeaker systems and exterior and interior signs serving the Common Areas; security; traffic control; policing; supervision with attendants; maintenance and replacement of trees and shrubs; maintenance, repair and replacement of the parking areas, including periodic patching or repaving thereof; maintenance and repair of the roof, including patching and general repairs to the roof membrane; maintenance and repair of all fixtures and equipment serving the Common Areas; heating, ventilating and air conditioning the Common Areas; and employing a staff to perform such obligations.

### 10.2 CAM Charge

(A)     For and during the first Lease Year of the Term, Tenant shall pay Landlord a Common Area maintenance charge ("CAM Charge") equal to the lesser of the following amounts: (a) Tenant's Proportionate Share (as defined in Section 10.4) of CAM Costs (as defined in Section 10.3) for such Lease Year, or (b) Two Dollars ($2.00) per square foot of GLA of the Premises per annum.

(B)     For and during each Lease Year subsequent to the first Lease Year of the Term, Tenant shall pay Landlord a CAM Charge equal to the lesser of the following amounts: (1) Tenant's Proportionate Share of CAM Costs for such Lease Year or (2) Tenant's CAM Charge payable for the immediately preceding Lease Year increased by five percent (5%).

(C)     Notwithstanding anything in this Lease to the contrary, Tenant shall have no obligation to pay the CAM Charge or any amounts relating to CAM Costs unless tenants occupying at least ninety percent (90%) of GLA of the Shopping Center make similar payments.

### 10.3 CAM Costs

(A)     CAM Costs Defined. The term "CAM Costs" means the costs and expenses incurred by Landlord in maintaining and repairing the Common Areas of the Shopping Center, including the following costs, none of which shall be a duplication of another cost or expense:

(1)     Cleaning, garbage collection and snow removal

(2)     The operation of and electricity for all lighting, loudspeaker systems and exterior and interior signs serving the Common Areas

(3)     Security and traffic control, policing and supervision with attendants

(4)     Maintenance, including water for landscaping, and replacement of trees and shrubs

(5)     Repairs to the parking areas, including periodic patching, re-striping or repaving thereof

(6)     Maintenance and repair of non-structural portions of the roof, including patching and general repairs to the roof membrane

(8)     The cost of Landlord's liability insurance for the Common Areas and property insurance, as set forth in Section 17.1 and 17.3.

(9)     The costs (the "Management Contractor Costs") of the on-site personnel including assistants, secretaries, janitors, workmen, maintenance personnel and security guards to the extent the same are allocated on a bona fide and reasonable basis between Common Area maintenance functions and other functions of the Shopping Center and are not excessive and unreasonably disproportionate to the services rendered (collectively, "Management Contractors"), provided that such costs shall include only the actual payment to the Management Contractors (excluding reimbursements or payments of frivolous benefits such as, by way of example and not limitation, staff parties and other entertainment costs, educational costs, vacation rentals, traffic citations and barbershop and hairdresser costs).

(10)     In recognition of the home office administrative functions performed by or on behalf of Landlord, or by Landlord's property manager, as well as a reasonable allocation to Landlord's home office overhead, an administrative surcharge (the "Administrative Surcharge") equal to ten percent (10%) of CAM Costs exclusive of (a) any contributions made by department stores and other stores that do not contribute to CAM Costs on a full proportionate share basis, provided that the square footage of such stores is permitted to be excluded, by other provisions of this Lease, from the denominator of Tenant's Proportionate Share fraction described in Section 10.4; (b) Common Area taxes; (c) Common Area utility costs; (d) insurance costs; and (e) the Management Employee Costs.

(B)     Capital Costs. With respect to any CAM Cost item that is treated as a capital cost or a capital expenditure under either generally accepted accounting principles ("GAAP") or Internal Revenue Code ("IRC") guidelines, CAM Costs for each Lease Year shall include only the annual amount of depreciation for such item permitted under GAAP or IRC guidelines (calculated on a straight-line basis) applicable to such Lease Year. The amortization of such depreciation shall be based upon the normal useful life of such item as specified under GAAP or the IRC guidelines but in any event not less than ten (10) years (or seven (7) years in the case of parking lot resurfacing). In no event shall the entire cost of such item be included in any one Lease Year.

(C)     Imputed Capitalization. Any CAM Cost item that exceeds Fifty Thousand Dollars ($50,000.00) per Lease Year (including "soft" costs in connection therewith such as architect's, engineering or consultant's fees) shall be treated as a capital cost, regardless of whether such item is treated as a capital cost or a capital expenditure under GAAP or IRC guidelines. If such item is a repair, alteration or improvement, the cost of such item shall be amortized on a straight-line basis over the expected useful life of such item but in any event not less than ten (10) years (or seven (7) years in the case of parking lot resurfacing). If such item is not a repair, alteration or improvement but the item applies to more than one Lease Year, then the cost of such item shall be amortized on a straight-line basis over the period to which it applies. CAM Costs for each Lease Year shall include only the annual amortized amount of such item.  In no event shall the entire cost of such item be included in any one Lease Year.

(D)     Exclusions From CAM Costs. Notwithstanding anything to the contrary in this Article, there shall be excluded or subtracted from or credited against CAM Costs, as the case may be, the following:

(1)     Net recoveries that reimburse or reduce CAM Costs received by Landlord from tenants as a result of any act, omission, default or negligence of tenants or as the result of breaches by tenants of the provisions of their leases which have caused Landlord to incur such CAM costs

(2)     Net recoveries from insurance policies taken out by Landlord, to the extent that the proceeds reimburse Landlord for expenses which have previously been included or which would otherwise be included in CAM Costs

(3)     Gross revenues from charges, if any, made for the use of the parking facilities and other Common Areas or facilities of the Shopping Center (including, without limitation, fairs, amusement activities, sale or rental of advertising space)

(5)     In the event there is a "food court" or areas reserved to serve customers of food tenants in the Shopping Center, all costs attributable to the repair, maintenance and operation of such food court or areas

(6)     The cost of the land or the construction of the buildings of the Shopping Center (including the improvements, fixtures or equipment thereto), whether initially or in connection with any replacement, remodeling or expansion thereof, whether mandated by Legal Requirements or otherwise, including, without limitation, costs of correcting (a) defective conditions in the buildings of the Shopping Center resulting from defects in or inadequacy of the initial design or construction of the same, or (b) code violations or the payment of fines or citations in connection therewith

(7)     The depreciation of the buildings of the Shopping Center (including the improvements, fixtures or equipment thereto)

(8)     The initial cost of the installation of the parking areas or facilities or the amortization or depreciation of such initial cost

(9)     The cost of providing or performing improvements, work or repairs to or within any portion of the premises of any other tenants or occupants in the Shopping Center or to any other building which is not part of the Common Areas

(10)    Any reserves for future expenditures or liabilities which would be incurred subsequent to the then current accounting year

(11)    Interest upon depreciation taken for the year in question or upon the undepreciated portion of any capital costs or capital expenses otherwise permitted hereunder

(12)    Any interest, costs, amortization of or principal payments on or with respect to any debt or financing as well as any interest and penalties incurred as a result of Landlord's late payment of any bill

(13)    Any bad debt loss, rent loss or reserves for bad debt or rent loss

(14)    Legal and other related fees; audit fees; leasing commissions; costs incurred in connection with the original development or original leasing of the Shopping Center or future re-leasing of the Shopping Center; advertising and promotional costs; and costs incurred in connection with disputes with other tenants and third parties

(15)    Costs of repairing or restoring any portion of the Shopping Center damaged or destroyed by any casualty or peril whether insured, uninsured or uninsurable

(16)    Costs in connection with the cleanup or removal of Hazardous Materials

(17)    The cost of acquiring, renting and maintaining works of art or art objects displayed in the Common Areas

(18)    The cost of compliance with Legal Requirements that were in effect at the delivery date under this Lease, including, without limitation, the Americans With Disabilities Act

(19)    Except for Management Employee Costs and the Administrative Surcharge, any management costs or fees of any kind that are paid for or allocable to management or supervising functions performed by Landlord or by any other entity or person whether or not such amounts are represented as a cost or a fee paid to unrelated third parties or are paid, charged by or imputed by or to Landlord or any entity related to Landlord, for the performance of such management or supervising functions

furnished, as reflected by costs for the same generally available from alternative unrelated sources in the geographic area in which the Premises is located

        (21)    Capital costs or capital expenses, except as expressly permitted in Subsections 10.3(B) and (C)

        (22)    The cost of holiday decorations

## 10.4    Tenant's Proportionate Share

The term "Tenant's Proportionate Share" means that amount, expressed as a percentage which is represented as a fraction, the numerator of which is the GLA of the Premises and the denominator of which is the GLA of all Shopping Center Buildings (including storage space available to any tenant, whether as an integral part of such tenant's premises or physically separate therefrom, and the area of all kiosks, pushcarts and mobile retail units, which area shall in no event be less than 100 square feet per kiosk, pushcarts or mobile retail unit), as such GLA may be changed from time to time. As of the date hereof, Tenant's Proportionate Share is 6.64% (9,628 square feet/145,000 square feet).

## 10.5    Payment of CAM Charge

(A)    Tenant shall pay Landlord, at Landlord's notice address or such other place designated by Landlord in writing, on the first day of each calendar month of the Term, the amount estimated by Landlord to be Tenant's monthly CAM Charge. Landlord may adjust such estimated amount at the end of any calendar month on the basis of Landlord's experience and reasonably anticipated CAM Costs, provided however that such estimated amount may not exceed on an annual basis one hundred five percent (105%) of Tenant's CAM Charge payable for the immediately preceding Lease Year.

(B)    Within ninety (90) days following the end of each Lease Year, Landlord shall furnish Tenant a statement covering such expired Lease Year, certified as correct by an authorized representative of Landlord, and itemized in reasonable detail sufficient to verify (1) the proper inclusion and exclusion of costs and expenses pursuant to this Article 10, (2) the computation of the CAM Charge, (3) the amount of Tenant's Proportionate Share of such CAM Costs, and (4) the payments made by Tenant during such Lease Year. If Tenant's aggregate payments exceed the actual CAM Charge, Landlord shall pay such excess to Tenant on or about the date on which Tenant receives such annual statement. If Tenant's aggregate payments are less than the actual CAM Charge, Tenant shall pay such deficiency to Landlord within thirty (30) days after Tenant's receipt of such annual statement.

## 10.6    Tenant's Audit

Tenant or its designated agent shall have the right at it's own cost and expense to audit and/or inspect Landlord's records (not more than once in any Lease Year) with respect to the CAM Charge, Taxes, Insurance and all Other Charges payable by Tenant under this Lease for any Lease Year. Tenant shall give Landlord not less than thirty (30) days' written notice of its intention to conduct any such audit. If such audit discloses that the amount paid by Tenant as Other Charges for the Lease Years under consideration has been overstated, Landlord shall rebate to Tenant the overcharge or, at Tenant's election, Tenant may offset the amount of the overcharge against Rent becoming due; and if the audit discloses that the amount paid by Tenant for such type of Other Charges during such Lease Years has been overstated by more than three percent (3%), then, in addition to rebating to Tenant the overcharge, Landlord shall also pay the costs incurred by Tenant for such audit.

## ARTICLE 11:  UTILITIES

## 11.1    Utilities

Tenant shall pay all charges for all utility services used by Tenant on the Premises.

The Premises may be used for any lawful retail purpose. The foregoing is referred to herein as the "Permitted Use," except that the Premises may not be used for any of the uses listed on Exhibit D, nor in violation of any of the Tenant exclusives attached as Exhibit D-1 pursuant to Section 12.2 below. Landlord shall take no action which would impair or limit Tenant's ability to conduct the Permitted Use.

## 12.2    Restrictions

(A)    Landlord acknowledges that Tenant is entering into this Lease in reliance upon its ability to conduct the Permitted Use without any limitation or restriction ("Restriction") whatsoever by reason of any exclusive provision or contractual restriction or limitation granted to any other party whatsoever and wherever located, which applies or pertains to the Premises or Tenant's use therein, except as set forth on Exhibits D or D-1.

(B)    Existing Restrictions. Landlord has furnished to Tenant the names of the parties and verbatim excerpts of all Restrictions existing as of the date of this Lease (an "existing Restriction"), regardless of such parties' use or business, which have been granted to any party and which are applicable to the Property. A schedule containing such existing Restrictions is attached hereto as Exhibit D-1. If Landlord fails to furnish any such existing Restriction, Landlord shall indemnify, defend and hold Tenant harmless from and against any and all Indemnified Costs relating to the enforcement by any party (including Landlord) of such existing Restriction. Tenant shall not violate the existing Restrictions set forth in Exhibit D-1. Landlord will use best efforts to secure an agreement from Blockbuster, Inc. to modify the "Tenant Exclusive" portion of Blockbuster's Lease Agreement with Landlord to permit Tenant to devote up to 150 square feet of the Premises to the sale of video and other products listed in Blockbuster's "Tenant Exclusive" product list. In the event Landlord fails to deliver such agreement to Tenant by July 1, 2002, Landlord will make a payment of Fifty Thousand Dollars ($50,000.00) to Tenant or Tenant may, at its election, offset said amount against Rent next coming due.

(C)    Future Restrictions. Any Restriction granted after the date of this Lease (a "future Restriction") that would in any way or manner pertain to the Permitted Use or the Premises shall have no application whatsoever to Tenant's use of the Premises, and all such future Restrictions shall expressly exclude, by specific reference, the Premises (as the same may be enlarged or decreased) during the Term (as the same may be extended pursuant to this Lease or otherwise). Landlord shall advise the beneficiaries of such future Restrictions of the provisions of Section 12.1 and this Section 12.2, and is hereby authorized to disclose such provisions verbatim to such parties. Landlord shall indemnify, defend and hold Tenant harmless from and against any and all Indemnified Costs relating to the enforcement by any party (including Landlord) of any future Restriction.

## 12.3    Days and Hours of Operation

(A)    Expressly subject to other provisions of this Lease, including, without limitation, Section 12.3(B) and Article 13, Tenant shall operate its business at the Premises during the days and hours of the Shopping Center designated by Landlord ("Designated Times"), or, in the absence of Designated Times, from 10:00 a.m. to 6:00 p.m., Mondays through Saturdays ("Minimum Times").

(B)    Notwithstanding anything in this Lease to the contrary, Tenant shall not be required to open or operate:

(1)    earlier than 10:00 a.m. or later than 11:00 a.m. Monday through Saturday, or earlier than 12:00 noon on Sunday (if Sundays are Designated Times);

(2)    later than 9:30 p.m. Monday through Saturday or 6:00 p.m. on Sunday (if Sundays are Designated Times);

(3)    at all if Tenant would thus be required to be open for business less than the Minimum Times or less than five hours on Sunday (if Sundays are Designated Times);

(5)     on Easter Sunday, Thanksgiving Day, Christmas Day or New Years Day; or

(6)     when to do so would violate any Legal Requirement, criminal or civil, or subject Tenant or its employees to a fine or penalty, whether criminal or civil in nature.

(C)     Tenant shall have the right, but not the obligation, to open for business on days and for hours in excess of Designated Times (or, in the absence thereof, Minimum Times).

## ARTICLE 13: CO-TENANCY REQUIREMENTS

### 13.1    Initial Key Store Requirements

(A)     The validity and effectiveness of this Lease and of Tenant's obligations hereunder, including without limitation Tenant's obligation to prepare the Preliminary Tenant Plans (or any other plans for the Premises), shall be conditioned upon Landlord entering into fully executed leases or operating agreements with the Key Stores.  Each such lease or operating agreement shall be for a term of not less than five (5) years from the Commencement Date, with requirements to open.  The requirements set forth in this Section 13.1 are referred to herein as the "Initial Key Store Requirements."

(B)     Based on the following representations and warranties by Landlord but subject to Section 13.1 (A), Tenant acknowledges that the Initial Key Store Requirements are satisfied.

(1)     With respect to fully-executed Key Store leases or operating agreements, Landlord represents and warrants that lease terms are longer than five years from this date and neither of the Key Stores leases contains a cancellation right by tenant other than in the context of damage or destruction or eminent domain.

(2)     With respect to fully-executed Key Store leases or operating agreements, a copy of the signature page of such lease or operating agreement showing the signatures of Landlord and the Key Store has been previously submitted by Landlord.

(3)     With respect to fully-executed Key Store leases or operating agreements, Landlord has submitted to Tenant verbatim extracts of the operating covenant in such lease or operating agreements, including any co-tenancy conditions or requirements and any other conditions to such party's obligation to operate.

### 13.2    Opening Requirements

(A)     Notwithstanding that the Construction Period may have expired, Tenant shall not be required to open the Premises for business, nor shall the Commencement Date occur or the obligation to pay Rent begin, until: (1) the Key Stores (as defined below), plus (2) retail stores (other than the Premises and the Key Stores) having an aggregate of seventy percent (70%) or more of the total GLA of the Shopping Center (other than the Premises and the Key Stores) shall have opened or shall be concurrently opening for business with Tenant (the "Opening Requirements").

(B)     The Key Stores are the following retailers occupying the floor area indicated:

| Tradename | Floor Area |
|---|---|
| Grand Union | 48,713 |
| Staples | 24,000 |

(C)     If Tenant elects in its sole discretion to open for business prior to the fulfillment of the Opening Requirements, then the Commencement Date shall be deemed to have occurred on the date Tenant opens the Premises for business (provided that Landlord shall continue to be obligated to satisfy the Delivery of Possession requirements). During the period from the Commencement Date until the fulfillment of the Opening Requirements (the "Interim Period"), Tenant shall pay to Landlord as a substitute rent (the "Interim Rent") for such Interim Period, in lieu of Minimum Rent, and Other Charges, an amount equal to the lesser of (1) two percent (2%) of

From and after the fulfillment of the Opening Requirements, Tenant shall commence the regular payment of Rent computed in the way and manner as provided by this Lease accruing from and after the date the Opening Requirements were met, in lieu of Interim Rent.

(D)     If the Opening Requirements have not been met within six (6) months after the expiration of the Construction Period, then Tenant shall have the right for a period of three (3) months thereafter and prior to the Opening Requirements being met, to terminate this Lease. Once such termination right has been exercised by Tenant, Tenant's termination shall not be affected or nullified by the fact that the Opening Requirements are later met.

(E)     If the Opening Requirements have not been met within nine (9) months after the expiration of the Construction Period, and Tenant has not terminated this Lease, then, effective the first day of the tenth (10th) month after the expiration of the Construction Period, Tenant shall have no further rights under this Section 13.2, provided that Tenant's obligation to operate and pay Rent shall be governed by the other provisions of this Lease, and provided further that any waiting period before which Tenant may exercise the Operating Requirement Remedies (as defined in Section 13.4) shall be deemed to have elapsed.

(F)     Tenant or its designated agent shall have the right at its own cost and expense to audit and/or inspect Landlord's records with respect to the Opening Requirements. Tenant shall give Landlord not less than thirty (30) days' written notice of its intention to conduct any such audit. If such audit discloses a violation of the Opening Requirements and Tenant elects to pay Interim Rent for such period of violation in accordance with Section 13.2(C), Landlord shall rebate to Tenant the overcharge or, at Tenant's election, Tenant may offset the amount of the overcharge against Rent becoming due.

## 13.3    Operating Requirements

(A)     Notwithstanding anything to the contrary in this Lease, Tenant shall not be required to open the Premises for business at all nor operate during Designated Times (or, in the absence thereof, Minimum Times) unless the Key Stores plus retail stores (other than the Premises and the Key Stores) having an aggregate of seventy percent (70%) or more of the total GLA of the Shopping Center (other than the Premises and the Key Stores) are also open for business during the Designated Times (or, in the absence thereof, Minimum Times) (the "Operating Requirements").

(B)     A store shall not be considered open for business if such store is open and operating (1) less than the Designated Times (or, in the absence thereof, Minimum Times), or (2) in less than substantially all of its space. Any of the foregoing events shall be deemed a failure of the Operating Requirements and may sometimes be referred to as a "Co-Tenancy Failure." If the Operating Requirements are not being met because a store is closed by reason of casualty, condemnation or the making of repairs or alterations (collectively, an "Excused Closure"), such Excused Closure shall not give rise to Tenant's right to pursue Operating Requirement Remedies unless such Excused Closure continues for more than a period of sixty (60) days. Any waiting period before which Tenant may exercise the Operating Requirement Remedies shall be deemed to run concurrently with such 60-day grace period for an Excused Closure. Landlord shall promptly notify Tenant of any Co-Tenancy Failure.

(C)     Landlord shall deliver to Tenant, upon Tenant's request from time to time, a notice certifying the then current tradename and GLA of each tenant of the Shopping Center. Tenant or its designated agent shall have the right at its own cost and expense to audit and/or inspect Landlord's records with respect to the Operating Requirements. Tenant shall give Landlord not less than thirty (30) days' written notice of its intention to conduct any such audit. If such audit discloses a violation of the Operating Requirements and Tenant elects to pay Alternate Rent for such period of violation in accordance with Section 13.4(A), Landlord shall rebate to Tenant the overcharge or, at Tenant's election, Tenant may offset the amount of the overcharge against Rent becoming due.

have the following rights:

(1)     Right to Close Remedy.  Tenant may close the Premises for business and, during such period of closure, Tenant shall pay Minimum Rent in lieu of all other Rent and perform all of such other obligations as are applicable to a vacant premises.  This remedy is referred to herein as the "Right to Close Remedy."  The exercise by Tenant of the Right to Close Remedy shall not disqualify or affect Tenant's right to terminate this Lease pursuant to Section 5.8.

(2)     Alternate Rent Remedy.  Tenant may remain open for business and pay monthly, as "Alternate Rent" during the period that the Operating Requirements are not being met, in lieu of Minimum Rent, and Other Charges, an amount equal to the lesser of:  (a) two percent (2%) of all Gross Sales made in the Premises for each month (or portion thereof) during such period, or (b) the amount of Minimum Rent then applicable. Each such payment of the Alternate Rent shall be made within thirty (30) days after the end of each month (except that the utilities portion shall be paid when due, if other than monthly) and shall be accompanied by Tenant's statement of Gross Sales made during the previous month.  This remedy is referred to herein as the "Alternate Rent Remedy."

(B)     Tenant may elect the Right to Close Remedy or the Alternate Rent Remedy alternately, from time to time.  Upon the date (the "Resumption Date") that the Operating Requirements are once again met for a continuous period of sixty (60) days with occupants under leases with terms of at least three (3) years, Tenant shall, in the case where Tenant had elected the Right to Close Remedy, reopen the Premises for business, and, in the case where Tenant had elected the Alternate Rent Remedy, cease the payment of the Alternate Rent, and in the case of either remedy resume (where the same had been otherwise suspended) the payment of regular Rent computed in the manner set forth in this Lease.

(C)     Termination Remedy.  If the Operating Requirements are not met for a continuous period of three (3) months, then, in addition to the Right to Close Remedy and the Alternate Rent Remedy, Tenant shall have the continuing right thereafter and while such condition continues, to terminate this Lease upon thirty (30) days' written notice to Landlord.  This remedy is referred to herein as the "Termination Remedy."  Once such Termination Remedy has been exercised by Tenant, Tenant's termination shall not be affected or nullified by the fact that the Operating Requirements have once again been met during the thirty (30) day termination notice period.

(D)     The Right to Close Remedy, the Alternate Rent Remedy and the Termination Remedy are collectively referred to herein as "Operating Requirement Remedies."  For purposes of this Article 13, the Operating Requirements shall not be deemed to have been met after a Co-Tenancy Failure unless and until Landlord provides Tenant reasonable written evidence that each substitution tenant (1) has opened for business and (2) has a binding lease or operating agreement with a term of three (3) years or longer (excluding any portion of the term subject to cancellation and excluding any option term) and with requirements to open and operate during the Designated Times (or, in the absence thereof, Minimum Times).

## 13.5    Substitution

(A)     If Landlord desires to substitute a retailer for one of the Key Stores for purposes of satisfying the Operating Requirements (but not the Initial Key Store Requirements or the Opening Requirements), Landlord shall submit the name of such substitute retailer to Tenant for its prior written approval. The approval of Tenant shall not be unreasonably withheld if:  (1) except as to Staples, the use to be conducted by such substitute retailer is substantially the same as that conducted by the Key Store it is intended to replace; (2) the merchandise sold by such substitute retailer is of equal or better quality, and is offered at similar price points as the Key Store it is intended to replace; and (3) such substitute retailer will operate a retail business from substantially all of the premises being vacated by the Key Store it is intended to replace.

(B)     The aforementioned right of approval of Tenant is solely for the purpose of determining whether such proposed replacement retailer qualifies as a Key Store for purposes of determining Tenant's rights under this Lease and is not intended to impair or restrict the freedom of

### 14.1 Landlord's Repairs

(A)     Except for repairs specifically required herein to be made by Tenant and subject to Articles 19 and 20, Landlord shall at all times, at its sole cost and expense, keep, replace and maintain in good condition, order and repair:

(1)     all portions of the Building other than the Premises;

(2)     all portions of the roof, roof structures, supports and walkpads (including Tenant's interior ceiling damaged from leaking, unless leaking is caused by Tenant or Tenant's agents), and all structural portions of the Premises, including but not limited to, the foundation and structural supports, exterior and load bearing walls, floors (but not floor coverings), gutters, downspouts and exterior doors;

(3)     all other portions of the Premises which constitute Landlord's Work for a period of one (1) year from the date of completion thereof or for the period of the warranties of Landlord's contractors, whichever is longer;

(4)     all utilities to the point of entry to the Premises;

(5)     all driveways, sidewalks, parking areas and all other Common Areas of the Property, including the removal of snow and ice therefrom;

(6)     latent defects in the Premises as well as any damage to the Premises caused by the willful act or the negligence of Landlord or Landlord's Agents.

(B)     The Construction Period shall be extended by one day for each day (or portion thereof) of delay in the performance of Tenant's Work caused by a failure to repair items for which Landlord is responsible.

### 14.2 Tenant's Right to Cure

Tenant shall give Landlord notice of any such repairs to be performed by Landlord and Landlord shall commence and complete such repairs as soon as is reasonably possible under the circumstances (and immediately in the event of an emergency) after having received notice. If Landlord fails to perform its obligations within a reasonable period, Tenant may perform the repairs or maintenance. In an emergency Tenant may undertake immediate repairs which would be Landlord's responsibility and notify Landlord promptly after such repairs have been undertaken. If Tenant undertakes such repairs, Tenant may deduct the cost thereof from the Rent next coming due, in addition to any other remedies Tenant may have. The term "emergency" as used in this Lease means the threat of immediate injury or damage to persons or property or the immediate imposition of a civil or criminal fine or penalty.

### 14.3 Entry by Landlord

(A)     Tenant shall permit Landlord and its representatives to enter the Premises at all reasonable times for the purpose of inspection, making repairs required to be made by Landlord pursuant to Section 14.1 and to comply with Legal Requirements. All rights of Landlord hereunder shall be exercised in a reasonable manner and so as to cause as little interference with Tenant's business as is reasonably possible, and in accordance with this Section 14.3.

(B)     Subsequent to Delivery of Possession, Landlord's right of access to the Premises shall also be subject to the following conditions:

(1)     Landlord shall give Tenant at least ten (10) days' prior written notice of the need for such entry, except in emergencies and shall specify the estimated time required for such work.

(3)     No columns, beams, girders, braces, supports (collectively, "Supports") or shafts of any kind may be installed in the Premises except to replace existing Supports or shafts. Replacements must be in the exact location of the item replaced and must be no larger in size or dimensions than such replaced item.

(4)     All pipes, ducts, utility lines, conduits or equipment ("Utility Lines") shall be located completely beneath the floor of the Premises or completely within the walls or completely above Tenant's hung ceiling in non-stockroom areas provided however that, if no finished ceiling is installed by Tenant in the non-stockroom portions of the Premises, such ceiling area shall not be available to Landlord for this purpose. If no ceiling is present in the stockroom area, then such Utility Lines shall be located at a height no lower than 11' from the finished floor of such area. Utility Lines placed in the Premises may not displace or interfere with the location or placement of Tenant's Utility Lines serving the Premises; it being understood that Tenant's Utility Lines have priority in their location in the Premises.

(5)     Such work shall be performed during hours that Tenant is not open for business (except in emergencies) unless Tenant, in the exercise of its sole and absolute discretion shall otherwise agree. If Landlord's work is expected to exceed two (2) days, then such work may not be performed during the period from August 1 through December 31 of any given year except for emergencies, fire or other casualty, eminent domain or to comply with specific deadlines imposed by Legal Requirements.

(6)     Any restoration work or alteration work at the Premises which is necessitated by or results from Landlord's entry, including, without limitation, any work necessary to conceal any element whose presence is permitted hereunder, shall be performed by Landlord at its expense or, at Tenant's election, by Tenant on Landlord's behalf and at Landlord's sole cost and expense.

(7)     Landlord shall indemnify, defend and hold Tenant harmless from and against any and all Indemnified Costs relating to Landlord's entry.

(8)     If Landlord's entry into the Premises pursuant to this Lease interferes with the conduct by Tenant of its business to such an extent that Tenant, in the exercise of its reasonable business judgment, must close the Premises for business, then Rent shall totally abate for each day or portion thereof that such interference continues. If Tenant remains closed for business by reason of such interference for more than ten (10) days, (which period shall not be subject to extension by reason of Force Majeure, as defined in Section 27.4) Tenant shall have the continuing right thereafter and prior to the cessation of such interference to terminate this Lease upon five (5) days' prior written notice to Landlord. Tenant shall have the right to re-enter the Premises following the cessation of the interference to remove Tenant's Personal Property.

(C)     At any time within the six (6) months immediately preceding the expiration of the Term, Landlord may show the Premises to prospective tenants and may, during such period, affix to any reasonably suited part of the Premises (but not in or upon a display window) a notice which is reasonable in size for letting or selling the Premises.

**14.4    Tenant's Repairs**

Subject to Section 16.2 and Articles 19 and 20, Tenant shall keep the interior non-structural portions of the Premises, in good condition, order and repair, including repairs to the HVAC system exclusively serving the Premises, except those conditions covered under any warranties of Landlord's contractors, damage by fire and other casualties, acts of governmental authorities, acts of God and the elements, and ordinary wear and tear. Tenant shall promptly replace all damaged plate glass windows and other glass forming part of the Premises with glass of the same quality and strength. Except as provided in Section 2.7, the Construction Exhibit, or the Approved Tenant Plans, or as otherwise approved by Landlord, Tenant shall not install any cooling tower or other air conditioning equipment on the roof of the Premises, nor shall Tenant otherwise pierce the roof for any reason, without Landlord's prior written consent thereto (which can be withheld in Landlord's reasonable discretion), and any such installation or piercing must be made by the roofing contractor whose bond or guarantee is then in effect.

## 15.1 Compliance With Legal Requirements

(A)     After the issuance of the initial certificate of occupancy for the Premises (or if no such certificate is customarily issued in the jurisdiction, then upon the full completion of Landlord's Work and Tenant's Work), Tenant shall be responsible only for complying with Legal Requirements within the Premises which are Tenant Generated (as defined below), whether structural or nonstructural. Landlord shall be solely responsible for compliance with all other Legal Requirements, whether structural or non-structural, and for Abatement Work.

(B)     The term "Legal Requirements" means all applicable current or future statutes, ordinances, orders, rules, regulations, judgments and requirements of public authorities with jurisdiction and all applicable requirements of Landlord's insurance carriers relating to the Premises (to the extent made known to the party responsible for complying therewith.

(C)     The term "Tenant Generated" means that the Legal Requirement was made necessary by any act or work performed by Tenant or Tenant's Agents or by the particular nature of Tenant's use (i.e. "apparel sales" as distinguished from "general retail") or by the particular manner in which Tenant conducts its permitted use, an omission of Tenant or a default by Tenant of any of the terms of this Lease. If Tenant is required to install a sprinkler system for the Premises as a result of a Tenant Generated Legal Requirement after the issuance of the initial certificate of occupancy for the Premises, then Landlord shall install, at its sole cost, an operational sprinkler main to an appropriate point of entry into the Premises ready for Tenant's hookup, and Tenant shall install, at its sole cost, the balance of the sprinkler system within the Premises.

### ARTICLE 16: ALTERATIONS

## 16.1 Alterations

Tenant may at any time during the Term, at its own expense, make or cause to be made any alterations, additions, removals or improvements (collectively, "Alterations") which are non-structural in nature upon or to the interior or exterior of the Premises, as Tenant deems desirable without Landlord's consent. Tenant may at any time during the Term, at its own expense, make or cause to be made any Alterations which are structural in nature upon or to the interior or exterior of the Premises, provided that Tenant has obtained Landlord's approval therefor (which approval shall not be unreasonably withheld, delayed or conditioned). Tenant, at its own expense, may also erect, install and remove at any time during the Term any Tenant's Personal Property and signs in, on, about, or outside the Premises as it deems desirable for the purpose of conducting its business. Tenant and Tenant's Agents (including its general contractor and subcontractors) shall not be required to post any type of security or performance bond or other security in connection with Alterations or other work at the Shopping Center. All Alterations shall be performed in a workmanlike manner in conformity with Legal Requirements and shall not endanger the structural integrity of the Premises.

## 16.2 Ownership and Surrender of Improvements

(A)     The ownership interest of all Improvements shall be vested in Landlord upon installation, regardless of whether Tenant performed or paid for such installation. As used herein, the term "Improvements" means any improvements, alterations (including Alterations, as defined in Section 16.1), additions, permanently-installed fixtures, HVAC equipment and other permanently-installed items in or about the Premises, regardless of who performed or paid for such installation, expressly excluding Tenant's trade fixtures, furniture, point of sale system, merchandise and personal property (collectively, "Tenant's Personal Property"). The ownership of Tenant's Personal Property and Tenant's signs shall remain at all times in Tenant, provided that Tenant shall repair damage to the Premises caused only by any removal. The ownership interest of the Dish and any safety systems (such as, without limitation, fire and security monitoring and alarm systems) installed at or about the Premises by Tenant's vendors shall remain at all times in Tenant's vendor, unless Tenant and Tenant's vendor otherwise agree.

(B)     Upon the expiration or early termination of this Lease, Tenant shall have the right, at Tenant's sole cost and expense, to remove or modify any portion of Tenant's storefront and

authorities, reasonable wear and tear or any other damage or condition that Tenant is not required to repair under this Lease. In the event that Tenant removes or modifies Tenant's storefront as hereinbefore provided; Tenant shall restore its storefront to a condition reasonably consistent with the condition of the Premises at the time of Delivery of Possession at its expense.

### 16.3   Mechanic's Liens

Tenant shall keep the Premises free from any liens arising out of any work performed, materials furnished or obligations incurred by Tenant. Tenant shall have the right, in good faith and at its own expense, to contest or protest any claim relating to such lien. If such lien is filed against the Premises, Tenant shall, within thirty (30) days after notice of its filing, bond over such lien. In the event of any contest or protest of such lien by Tenant, provided that Tenant has bonded over such lien within such thirty (30) day period, Landlord shall not pay the claimant or discharge the lien on Tenant's account. Tenant shall be under no obligation to Landlord for any sums expended by Landlord in violation of the foregoing.

## ARTICLE 17:  INSURANCE

### 17.1   Landlord's Insurance

Landlord shall maintain "All Risk" property insurance at least as broad as the Insurance Services Office's Causes of Loss Special Form, insuring the Shopping Center Buildings, Common Areas, the Premises and the Improvements, in an amount equal to one hundred percent (100%) of the full replacement cost thereof and so as to prevent the application of co-insurance provisions. The CAM Charge includes the cost of such property insurance, and Tenant shall have no other obligation to reimburse Landlord for the cost of such property insurance or any other insurance maintained by Landlord, except as set forth in Section 17.3 (A).

### 17.2   Tenant's Insurance

Tenant shall maintain, at its expense, from the date Tenant physically occupies the Premises, "All Risk" property insurance at least as broad as the Insurance Services Office's Causes of Loss Special Form, insuring Tenant's Personal Property, in an amount equal to one hundred percent (100%) of the full replacement cost thereof and so as to prevent the application of co-insurance provisions.

### 17.3   Liability Insurance

(A)     Landlord shall maintain with respect to Common Areas, Commercial General Liability Insurance on an occurrence basis with a minimum limit of liability in the amount of Two Million Dollars ($2,000,000.00). The CAM Charge includes liability insurance regarding the Common Areas.

(B)     Tenant shall maintain with respect to the Premises, Commercial General Liability Insurance on an occurrence basis with a minimum limit of liability in the amount of Two Million Dollars ($2,000,000.00).

(C)     Tenant shall maintain Worker's Compensation Insurance covering all employees of Tenant with respect to whom death or bodily injury claims could be asserted against Landlord or Tenant, as required by the law of the State in which the Premises are located;

(D)     Tenant's liability insurance maintained pursuant to Section 17.3(B) shall name Landlord, Landlord's property manager, and all mortgagees as additional insureds.

### 17.4   Waiver of Subrogation

Each party, on behalf of itself and on behalf of anyone claiming under or through it by way of subrogation or otherwise, waives all rights and causes of action against the other party and such party's Agents and invitees for any liability arising out of any loss or damage in or to the Premises, its contents and the Property caused by: (i) any peril normally covered under "All Risk" Special

this Section 17.4, the waiver of subrogation contained herein shall apply only to any loss or damage in excess of One Hundred Thousand Dollars ($100,000.00) per occurrence. This release and waiver shall be complete and total even if such loss or damage may have been caused by the negligence of the other party or such party's Agents or invitees and shall not be affected or limited by the amount of insurance proceeds available to the waiving party, regardless of the reason for such deficiency in proceeds. If one party's insurance carrier prohibits waiver of subrogation, then each party's release and waiver shall become null and void as each waiver is given in consideration for the other. Each party covenants that, from and after Delivery of Possession, its insurance policies will contain waiver of subrogation endorsements, and, if such endorsements for any reason are about to become unavailable, it will give the other party not less than thirty (30) days' prior written notice of such impending unavailability.

## 17.5    General Requirements

All policies of insurance required to be maintained by Landlord or Tenant shall be issued by insurance companies having an adjusted policy holder's surplus of at least Two Hundred Fifty Million Dollars ($250,000,000.00) and authorized to do business in the state in which the Premises is located. All policies of insurance shall include a written undertaking from the insurer to notify all insureds and additional insureds at least ten (10) days' prior to cancellation for nonpayment of premiums, and at least thirty (30) days' prior to cancellation for any other reason. Either party may provide any insurance required hereunder under so-called blanket policies covering other parties and locations so long as the coverage required hereunder is not diminished. Upon request, either party shall furnish the other with a certificate of insurance evidencing any such policy. So long as Tenant or Tenant's parent corporation has a net worth of Ten Million Dollars ($10,000,000.00) or more, Tenant may self-insure for the coverages required in Section 17.2.

## ARTICLE 18:  INDEMNIFICATION

## 18.1    Indemnification

Subject to Section 17.4, each party (in the capacity of "Indemnitor") hereby agrees to indemnify, defend and hold the other (in the capacity of "Indemnitee") harmless from and against all costs, expenses, claims, suits, causes of action, liabilities, losses, injuries and damage, including, without limitation, reasonable attorneys' fees and costs (collectively, "Indemnified Costs") relating to or resulting from bodily injuries, including death, and from injury or destruction of tangible property occurring on the Premises or in other portions of the Building, the Shopping Center Buildings, the Property or on other adjoining property owned or controlled by Landlord and arising out of such Indemnitor's acts or omissions or use thereof except to the extent caused by the negligent or intentional act or omission of the Indemnitee or its Agents or other tenants. The Indemnitor shall be promptly notified of any suits, proceedings, claims or demands for which the Indemnitee requests indemnification. The Indemnitor shall have the right to assume the entire control of the defense thereof and the Indemnitee shall cooperate fully with the Indemnitor in such defense.

## ARTICLE 19:  DAMAGE AND DESTRUCTION

## 19.1    Insurable Casualty

(A)      Obligation to Rebuild. If the Shopping Center Buildings, the Building or the Premises is damaged or destroyed by an Insurable Casualty (as defined below), Landlord shall with due diligence promptly repair or restore the damage (other than damage to the nonstructural Improvements installed by Tenant) to the condition that existed immediately prior to such damage or destruction, consistent with Legal Requirements. As soon as reasonably possible thereafter, Tenant shall repair or restore so much of the nonstructural Improvements installed by Tenant as are consistent with Tenant's intended use of the Premises. Tenant shall have the right to commence Tenant's repairs immediately after such damage. All work performed by the parties shall be in accordance with then existing Legal Requirements. The term "Insurable Casualty" means a casualty or peril (1) required to be covered by this Lease, or (2) normally covered or coverable under the insurance actually carried or required to be carried by the parties pursuant to this Lease.

(25%) of the replacement cost of the Premises, then either Landlord or Tenant may terminate this Lease by giving written notice thereof to the other party within sixty (60) days after the date of such damage or destruction. If Landlord terminates this Lease in accordance with this Section 19.1, Tenant may nullify Landlord's termination within thirty (30) days after receipt thereof by giving notice to Landlord that Tenant elects to extend the Term pursuant this Lease (or any future amendment), in which event the parties shall proceed to restore in accordance with Subsection 19.1(A).

## 19.2   Uninsurable Casualty

(A)     Obligation to Rebuild. If the Shopping Center Buildings, the Building or Premises is damaged or destroyed by an Uninsurable Casualty (as defined below), Landlord shall with due diligence promptly repair or restore the damage (other than damage to the nonstructural Improvements installed by Tenant) to the condition that existed immediately prior to such damage or destruction, consistent with Legal Requirements. As soon as reasonably possible thereafter, Tenant shall repair or restore so much of the nonstructural Improvements installed by Tenant as are consistent with Tenant's intended use of the Premises. Tenant shall have the right to commence Tenant's repairs immediately after such damage. All work performed by the parties shall be in accordance with then existing Legal Requirements. The term "Uninsurable Casualty" means a casualty or peril which is not an Insurable Casualty.

(B)     Termination Right. If the cost of such repair or restoration work due to an Uninsurable Casualty required to be performed by either party is reasonably estimated to exceed twenty-five percent (25%) of the replacement cost thereof, then either party may, within forty-five (45) days after such damage or destruction, give notice of its intention not to repair its portion and terminate this Lease, in which event this Lease shall terminate, provided that no termination by Landlord shall be effective unless Landlord has previously or simultaneously terminated the leases of all other tenants in the Shopping Center. If either party (the "Terminating Party") has given such notice of intention not to repair or restore, this Lease shall terminate upon the expiration of thirty (30) days after receipt by the other party of such notice unless such other party (the "Electing Party") shall elect, by notice to the Terminating Party within such 30-day period, to repair or restore its portion of such damage or destruction. If the Electing Party elects to repair or restore its portion of such damage or destruction, this Lease shall continue in full force and effect and the Electing Party shall proceed to make its portion of such repairs and restoration as soon as reasonably possible. Upon completion of the Electing Party's portion of such repair or restoration work, the Terminating Party shall reimburse the Electing Party an amount equal to twenty-five percent (25%) of such replacement cost. Notwithstanding the foregoing, Landlord shall not have the right to make such election during the last year of the Term without Tenant's consent.

## 19.3   Damage or Destruction Prior to Delivery of Possession

If the Shopping Center Buildings, the Building or the Premises is damaged or destroyed prior to Delivery of Possession by an Insurable Casualty, Landlord shall, with due diligence, promptly repair and restore the Building and/or Premises to the condition that existed immediately prior to such damage or destruction, consistent with Legal Requirements. Delivery of Possession shall not be deemed to have occurred until all such repair or restoration work is complete, subject to the punchlist work.

## 19.4   Delay in Rebuilding

If Landlord does not complete its repair and restoration work of the Premises under this Article 19 within twelve (12) months after such damage or destruction (the "Restoration Period"), Tenant may, but shall have no obligation to, perform any or all repairs or restoration work of the Premises and deduct the cost thereof from Rent thereafter becoming due. In addition, if Landlord does not complete its repair and restoration work of the Shopping Center Buildings, the Building or the Premises during the Restoration Period, Tenant, at its option, may terminate this Lease by giving written notice thereof to Landlord at any time prior to completion of the repairs or reconstruction. The Restoration Period shall not be extended by reason of Force Majeure notwithstanding anything contained in this Lease to the contrary.

proportionate reduction of Rent from the date of the initial damage or destruction until the repairs or restoration work by Landlord and Tenant are complete, such proportionate reduction to be based upon the extent to which such damage or destruction and the making of such repairs or restoration shall interfere with the use conducted by Tenant in the Premises. If from the standpoint of prudent business management the Premises cannot be operated at all during the repair or restoration work, then Rent shall totally abate from the date of the initial damage or destruction (or date of closure of the Premises, if later) until the repairs or restoration work by Landlord and Tenant are complete.

**19.6    Termination**

If this Lease is terminated, such termination shall be effective thirty (30) days following the giving of notice thereof. In such event, neither party shall have any obligation to perform any repair or restoration work.

**19.7    Proceeds**

If this Lease is not terminated, the proceeds of the property insurance described in Article 17 applicable to the nonstructural Improvements installed by Tenant shall be promptly made available and released to Tenant, and the proceeds of the property insurance described in Article 17 applicable to the Shopping Center Buildings, the Building and the Premises (other than the nonstructural Improvements installed by Tenant) shall be promptly made available and released to Landlord. If this Lease is terminated, Tenant shall have no interest in the proceeds of the property insurance described in Article 17 applicable to the Shopping Center Buildings, the Building and the Premises (including the nonstructural Improvements installed by Tenant).

### *ARTICLE 20: EMINENT DOMAIN*

**20.1    Taking**

The term "Taking" means either: (1) a taking of all or any part of, or any interest in, the Premises, the Building, the Shopping Center Buildings, the Common Areas or any other part of the Property by reason of any exercise of the power of eminent domain, or (2) a transfer of all or any part of, or any interest in, the Premises, the Building, the Shopping Center Buildings, the Common Areas or any other part of the Property made in avoidance of an exercise of the power of eminent domain. Landlord shall immediately notify Tenant of any pending or threatened Taking and of all related proceedings including the settling of any award.

**20.2    Total Taking**

In the event of a Taking of all of the Premises or the Building, the Shopping Center Buildings, the Common Areas or the Property, this Lease shall terminate as of the date of such Taking and all of Tenant's obligations hereunder, including its obligation to pay Rent accruing from and after the date of the Taking shall terminate as of the date of such Taking.

**20.3    Partial Taking**

(A)    Tenant may terminate this Lease by written notice to Landlord at any time within sixty (60) days after possession is taken by the condemning authority in the event of a Taking of:

(1)    more than ten percent (10%) of the Premises;

(2)    more than twenty five percent (25%) of the Building or the Shopping Center Buildings;

(3)    more than ten percent (10%) of the Common Areas (including the parking areas); or

(4)    any driveways serving the Shopping Center from Main Street South or Brown Road without replacement thereof.

sixty (60) days after possession is taken by the condemning authority in the event of a Taking of:

     (1)     more than ten percent (10%) of the Premises;

     (2)     more than twenty-five percent (25%) of the Building or the Shopping Center Buildings, provided that Landlord has previously or simultaneously terminated the leases of all other tenants in the Shopping Center;

     (3)     more than ten percent (10%) of the Common Areas (including the parking areas), provided that Landlord has previously or simultaneously terminated the leases of all other tenants in the Shopping Center; or

     (4)     any driveways serving the Shopping Center from Main Street South or from Brown Road without replacement thereof, provided that Landlord has previously or simultaneously terminated the leases of all other tenants in the Shopping Center.

Such termination shall be effective upon the earlier to occur of sixty (60) days after Tenant's receipt of such notice or the date on which Tenant surrenders the Premises to Landlord.

## 20.4    Restoration

     (A)     In the event this Lease is not terminated as herein provided, then Landlord shall with due diligence, promptly restore, at its sole cost and expense, the affected portion and, if applicable, so much of the remainder of the Premises to a complete architectural unit to the extent that the same existed on the date of Delivery of Possession and in accordance with Legal Requirements. As soon as reasonably possible after the completion of Landlord's Work and Tenant's receipt of Tenant's portion of the award as provided in Section 20.5, Tenant shall repair or restore so much of the nonstructural Improvements installed by Tenant as are consistent with Tenant's intended use of the Premises. Tenant shall have the right to commence Tenant's restoration immediately after such Taking. All work performed by the parties shall be in accordance with then existing Legal Requirements. If the Common Areas are taken, then Landlord shall promptly restore such Common Areas or furnish substitute facilities which are functionally equivalent or better than and within a reasonable distance from those portions taken.

     (B)     Tenant shall be entitled to a proportionate reduction of Rent from the date of the Taking until completion of the restoration by Landlord and Tenant, such proportionate reduction to be based upon the extent to which the area affected by the Taking and the restoration work shall interfere with the use conducted by Tenant in the Premises (regardless of whether the Premises were physically taken). If from the standpoint of prudent business management the Premises cannot be operated at all during the repair or restoration work, then Rent shall totally abate from the date of the initial damage or destruction (or date of closure of the Premises, if later) until the repairs or restoration work by Landlord and Tenant are complete. Rent shall be permanently abated in proportion to the amount of GLA of the Premises taken.

## 20.5    Award

     Each party shall be entitled to receive from the entire award made with respect to the Taking that portion thereof allowed by Legal Requirements for its respective property interest appropriated as well as any damages suffered thereby. Notwithstanding the foregoing, if this Lease is not terminated, Tenant shall in all events be entitled to receive out of the entire award an amount equal to the replacement cost of the nonstructural Improvements installed by Tenant for rebuilding purposes pursuant to Section 20.4. If this Lease is terminated, Tenant shall have no interest in that portion of the award applicable to the Improvements installed by Tenant. Tenant shall have the right to participate in any eminent domain proceedings with counsel selected by Tenant.

## ARTICLE 21: ASSIGNMENT AND SUBLETTING

Except for a Permitted Transaction (as defined in Section 21.2), Tenant shall not assign this Lease or any interest therein nor sublet the Premises or any portion thereof without the prior written consent of Landlord, which consent shall not be unreasonably withheld, delayed or conditioned.

## 21.2    Permitted Transactions

(A)    Tenant may assign this Lease or any interest therein or sublet the Premises or any portion thereof, without Landlord's consent, in any of the following transactions ("Permitted Transactions"): (1) to a Related Party (as defined below); (2) in connection with a transfer of three (3) or more of Tenant's stores (a "Multi-Store Transaction"); and (3) to a concessionaire, franchisee or licensee (collectively a "Concessionaire") for the operation of any portion of the business to be conducted at the Premises.

(B)    The term "Related Party" means: (1) an entity which controls, is controlled by, or is under common control with Tenant (an "Affiliate"); or (2) a successor to Tenant by merger or consolidation or acquisition of substantially all of the assets or stock of Tenant or an Affiliate thereof.

## 21.3    Release of Liability

(A)    In the event of an assignment of this Lease, Tenant shall remain liable for the performance by the assignee-in-possession of Tenant's obligations hereunder; provided however, that, if Tenant's assignee or any subsequent assignee (other than an Affiliate of Tenant) has a net worth of at least Twenty Million Dollars ($20,000,000.00), determined as of the end of the most recent fiscal year of such assignee immediately preceding such assignment (unless more current figures are available), then Tenant shall be released and discharged from any further liability under this Lease. The provisions of this Subsection 21.3(A) shall not apply where the assignee-in-possession is an Affiliate of Tenant.

(B)    Tenant's liability as assignor-guarantor shall not extend to obligations greater than those contained in this Lease upon the date of Tenant's assignment unless Tenant specifically consents thereto in writing.  Landlord shall notify assignor-guarantor of all failures of performance on the part of the assignee-in-possession which, with the passage of time, could ripen into an Event of Default (as defined in Section 22.1), within thirty (30) days after such failure of performance occurs, whether or not Landlord has given the assignee-in-possession notice of such failure. Following the assignee-in-possession's failure to cure the default within all applicable cure periods, assignor-guarantor shall be accorded an additional period of ten (10) days after receipt of the default notice in the case of monetary failures and thirty (30) days after receipt of the default notice in the case of non-monetary failures (subject to Excused Delays (as defined in Section 22.1) and Force Majeure) in which to cure such failures.  In the event Landlord fails to notify assignor-guarantor of a failure of performance within the time required herein, assignor-guarantor's liability shall be limited in the aggregate to an amount equal to Rent arrearages (or for an equivalent amount or value with respect to any other failure of performance hereunder) dating back three (3) months prior to the date on which demand for performance is made upon such assignor-guarantor.  The provisions of this Subsection 21.3(B) shall not apply where the assignee-in-possession is an Affiliate of Tenant.

## ARTICLE 22: DEFAULT

## 22.1    Default by Tenant

(A)    The following events shall constitute an "Event of Default:"

(1)    the failure by Tenant to pay Rent due under this Lease within ten (10) days after Tenant's receipt of written notice from Landlord that the same is overdue;

(3)    the failure by Tenant to perform or observe any other term or condition of this Lease within thirty (30) days after Tenant's receipt of written notice thereof from Landlord; provided however that if the nature of such failure is such that it cannot reasonably be cured within such 30-day period (an "Excused Delay"), then Tenant shall have such additional time as is

of the assets of Tenant located at the Premises and where possession is not restored to Tenant within ninety (90) days;

(5)    a general assignment by Tenant for the benefit of creditors; or

(6)    the occurrence of any proceeding commenced by or against Tenant under any insolvency or bankruptcy act and where, in the case of involuntary actions filed against Tenant, the same are not discharged within ninety (90) days after the date of commencement.

**22.2    Remedies of Landlord**

(A)    Upon an Event of Default, Landlord may (subject to Legal Requirements) by written notice to Tenant:

(1)    declare this Lease terminated, in which event this Lease shall terminate with the same force and effect as though the date set forth in the notice of termination were the date originally set forth herein for the expiration of the Term, and Tenant shall vacate and surrender the Premises but shall remain liable (subject to the limitations set forth in this Section 22.2) for all obligations arising during the balance of the Term;

(2)    without terminating this Lease, terminate Tenant's right to possession of the Premises; or

(3)    without terminating Tenant's right to possession of the Premises, continue this Lease in full force and effect.

(B)    Notwithstanding the foregoing and regardless of Landlord's election to pursue any of the remedies described above or such other remedies as are allowed at law, Landlord's remedy or recovery for the collection of Rent past due or to become due under this Lease shall be limited exclusively to either of the following: (1) without re-entry into the Premises, Landlord may institute suit from time to time for the recovery of past due Rent, or (2) Landlord may re-enter the Premises pursuant to process of law and dispossess Tenant and all other occupants therefrom (subject to Section 22.3) and remove and store all property therein in a public warehouse or elsewhere at the cost and for the account of Tenant, and Landlord may institute suit from time to time for the recovery of past due Rent.

(C)    Upon an Event of Default, Landlord may make such reasonable alterations and repairs as may be necessary in order to relet the Premises, and may relet the Premises or any part thereof for such term (which may be for a term extending beyond the Term) and at such rental and upon such other terms and conditions as Landlord may deem advisable. Upon each reletting all rentals and other sums received by Landlord therefrom shall be applied in the following order:

(1)    to the payment of any indebtedness other than Rent due hereunder;

(2)    to the payment of any costs and expenses of such reletting including reasonable brokerage fees, attorneys' fees and costs of such alterations and repairs and Landlord's collection costs (collectively, "Other Damages");

(3)    to the payment of Rent past due and unpaid; and

(4)    the residue, if any, shall be held by Landlord and applied in payment of future Rent which shall continue to accrue upon the days that the same would otherwise have become due and payable hereunder if no Event of Default had occurred.

(D)    If such rentals and other sums received from such reletting during any month are less than Rent to be paid during that month by Tenant hereunder, Tenant shall pay such deficiency to Landlord. Any such deficiency shall be calculated and paid monthly. If such rentals and sums shall be more than Rent, Tenant shall have no right to the excess but shall be entitled to a credit in the amount of such excess against Rent to become due in the future. Landlord shall use reasonable

(E) Acceleration Prohibited. Whether or not this Lease or Tenant's right to possession is terminated by Landlord or by any provision of law or court decree, Tenant shall have no obligation to pay any Rent until the date it would otherwise have become due in the absence of any Event of Default. Landlord shall have no right to accelerate (i.e. declare the same immediately due and payable) any Rent which would have become due in the future ("Future Rent"). In the event Landlord terminates this Lease, Tenant's liability for Future Rent (as well as any damages specifically in lieu of or representing such Future Rent) shall cease except to the extent and manner provided in Subsection 22.2(B).

## 22.3 Default by Landlord

Landlord shall be in default hereunder if Landlord fails to perform any of its obligations under this Lease within thirty (30) days (ten (10) days in the case of monetary obligations owed by Landlord to Tenant) after receipt of written notice from Tenant specifying such failure, subject to Excused Delays. If Landlord fails to cure within the applicable time period, then Tenant may, at its option, in addition to any other remedies at law or equity, incur any expense necessary to perform the obligations of Landlord specified in such notice and deduct such reasonable expense from rent becoming due hereunder.

## ARTICLE 23: SUBORDINATION

### 23.1 Non-Disturbance Agreement from Present Encumbrance Holder

Landlord shall deliver to Tenant a recordable non-disturbance agreement substantially in the form of **Exhibit E** attached hereto (the "Non-Disturbance Agreement"), duly executed by each holder of a mortgage, deed of trust, ground or master lease, sale-leaseback transaction or other security instrument encumbering the Premises (collectively, an "Encumbrance") placed on the Premises on or before the date of this Lease, which Non-Disturbance Agreement provides that, in the event of a foreclosure, sale under a power of sale, ground or master lease termination or transfer in lieu of any of the foregoing or the exercise of any other remedy pursuant to any such Encumbrance (a) Tenant's use, possession and enjoyment of the Premises shall not be disturbed and this Lease shall continue in full force and effect so long as no Event of Default on the part of Tenant has occurred, and (b) this Lease shall automatically become a direct lease between any successor to Landlord's interest, as landlord, and Tenant as if such successor were the landlord originally named hereunder.

### 23.2 Non-Disturbance Protection From Future Encumbrance Holder

At Landlord's option, this Lease shall become subordinate to any Encumbrance placed on the Premises after the date of this Lease, provided that Landlord delivers to Tenant a recordable Non-Disturbance Agreement (as described in Section 23.1), duly executed by the holder of the Encumbrance.

### 23.3 Recognition of Subtenants

If this Lease is terminated, whether voluntarily or by reason of an Event of Default of Tenant or if Landlord re-enters into possession of the Premises by reason of an Event of Default of Tenant with or without termination of this Lease, Tenant's interest in all existing subleases shall be deemed assigned to and assumed by Landlord and such subleases shall become direct leases between Landlord and the subtenants thereunder.

## ARTICLE 24: ESTOPPEL CERTIFICATE

### 24.1 Estoppel Certificate

(A) Tenant shall, within twenty (20) days after request by Landlord, deliver a written certificate duly executed by an authorized party on behalf of Tenant certifying to the third party recipient specified on such certificate:

(2)     whether, to Tenant's actual knowledge, there are then existing any offsets or defenses in favor of Tenant against the enforcement of any of the terms, covenants and conditions of this Lease and, if so, specifying the same;

(3)     whether, to Tenant's actual knowledge, Landlord has observed and performed the terms, covenants and conditions on its part to be observed and performed, and, if not, specifying the same;

(4)     the dates to which Rent has been paid; and

(5)     any other factual matter relating to this Lease, provided however that such factual matters do not increase any of Tenant's obligations under this Lease nor decrease any of Tenant's rights hereunder nor require Tenant to take any action other than to address or answer the factual matter raised.

(B)     If Tenant fails to deliver such certificate within such 20-day period, the factual matters to be certified in such certificate with respect to the matters set forth in clauses (1) through (4) of Subsection 24.1(A) above, shall be presumed to be true and correct as between Tenant and such third party recipient. However, Tenant's failure to deliver such certificate within such 20-day period shall not create any presumption (whether conclusive or prima facie) with respect to the matters set forth in clause (5) of Subsection 24.1(A) above. In no event shall the issuance of such certificate subject Tenant to any liability whatsoever, despite the negligent or otherwise inadvertent failure of Tenant to disclose correct and/or relevant information, or constitute a waiver with respect to any act of Landlord for which approval by Tenant was required but not sought or obtained, provided that, as between Tenant and such third party recipient for whose benefit the certificate is issued, Tenant shall be estopped from denying the accuracy of such certificate. Tenant shall not be estopped as a result of such certificate (or the presumptions created as a result of Tenant's failure to issue such certificate) as between Tenant and Landlord or Landlord's Affiliates.

### ARTICLE 25:  RECORDING

### 25.1    Memorandum of Lease

This Lease shall not be recorded, but, the parties shall, simultaneously with the execution of this Lease, enter into a short form memorandum of lease in the form of **Exhibit F** attached hereto (the "Memorandum of Lease"), which may be recorded by either party at its expense.

### ARTICLE 26:  HOLDING OVER

### 26.1    Holding Over

If Tenant remains in possession of the Premises after the expiration or early termination of the Term with Landlord's consent, Tenant shall become a tenant from month to month at the Minimum Rent payable during the last month of the Term and upon the other terms and conditions specified in this Lease, provided that such tenancy may be terminated by Landlord or Tenant upon thirty (30) days' prior notice.

If Tenant remains in possession of the Premises after the expiration or early termination of the Term without Landlord's consent, Tenant shall become a tenant from month to month at one hundred fifty percent (150%) of the Minimum Rent payable during the last month of the Term and upon the other terms and conditions specified in this Lease, provided that such tenancy may be terminated by Landlord or Tenant upon thirty (30) days' prior notice.

### ARTICLE 27:  MISCELLANEOUS

### 27.1    Quiet Enjoyment

So long as no Event of Default on the part of Tenant has occurred, Tenant shall have the right to peaceably and quietly hold and enjoy the Premises for the Term and neither Landlord, nor

**27.2   Ownership; Authority**

Landlord represents and warrants that it is the fee simple owner of the Premises, that it has full right, power and authority to make, execute and deliver this Lease.

**27.3   Rules and Regulations**

Tenant shall not be bound by any rules and regulations relating to the Shopping Center or the Premises promulgated by Landlord or Landlord's Agents, other than the rules and regulations set forth on Exhibit C hereto (collectively, "Rules")

**27.4   Force Majeure**

If either party hereto is delayed or hindered in or prevented from the performance of any obligation required hereunder by reason of strikes, lock-outs, labor troubles, inability to procure materials, failure of power, restrictive governmental laws or regulations, riots, insurrection, war, military or usurped power, sabotage, unusually severe weather, fire or other casualty or other reason (but excluding inadequacy of insurance proceeds, financial inability or the lack of suitable financing) of a like nature beyond the reasonable control of such delayed party ("Force Majeure"), the time for performance of such obligation shall be extended for the period of the delay, provided that Force Majeure shall not excuse Tenant from the prompt and timely payment of the Rent when due under this Lease except when (i) the Commencement Date is delayed by reason of Force Majeure, or (ii) such payment is excused pursuant to other provisions of this Lease.

**27.5   Brokers**

Landlord and Tenant represent to each other that each has dealt with no broker in connection with this Lease or the leasing of the Premises and each party shall indemnify, defend and hold the other party harmless from and against any and all Indemnified Costs relating to a breach of the foregoing representation by the indemnifying party.

**27.6   Notices**

(A)   Notice. All notices to be given hereunder shall be in writing and may be served personally or forwarded by registered or certified mail, return receipt requested or may be forwarded by United States Express Mail Service, or by Federal Express or other private overnight delivery service or by telex or telegram (but not facsimile) provided that a receipt or proof of delivery thereof can be produced, and shall be addressed to the respective parties as follows:

To Landlord:        Southbury 84 Associates Limited Partnership
                    c/o Robert Elder Associates
                    50 Milk Street
                    Boston, MA 02109
                    Attn: Mr. Robert C. Elder

            with a copy given to the following party:

                    Goodwin, Proctor & Hoar, L.L.P.
                    Exchange Place
                    Boston, MA 02109
                    Attn: Elizabeth McDermott, Esq.

To Tenant:          c/o The Gap, Inc.
                    900 Cherry Avenue
                    San Bruno, CA 94066
                    Attn: Real Estate Law

or to such other address as may be contained in a notice from either party to the other given pursuant to this Section 27.6.

option to extend the Term, if any, or to terminate this Lease pursuant to any right to do so as contained herein shall be deemed effective as of (1) the date or time of postmark, if such notice is sent by Registered or Certified Mail or U.S. Express Mail, or (2) the time of receipt into the possession of a messenger or private overnight carrier, provided that the date or time of receipt by such messenger or carrier can be established, and provided further that, regardless of the method of delivery, such notice is delivered in regular course.

## 27.7 Advertising and Trademarks

Tenant shall not be required to advertise its business in any manner nor participate in or pay any charges for any advertisement or promotion of any kind nor participate in Shopping Center events of any kind, including, without limitation, any sales or price reductions of its merchandise or the giving away of its merchandise or anything of value, without Tenant's consent in each instance, which consent may be withheld by Tenant in its sole discretion. Landlord recognizes that Tenant's trademarks, servicemarks, trade name, copyrights and logo of its business (collectively "Intellectual Property Rights") are proprietary rights of Tenant which are protected under federal and state law. Neither Landlord nor any merchants' association, promotion fund, media fund or any other entity or agency engaged in the promotion of the Shopping Center shall use Tenant's Intellectual Property Rights in any manner whatsoever without Tenant's prior written consent in each and every instance, which consent may be withheld in Tenant's sole discretion. In the event of a violation of these provisions, then, in addition to all other rights or remedies available to Tenant at law or in equity, Rent shall abate for thirty (30) days.

## 27.8 Year 2000 Compliance

Landlord represents and warrants that all software product or systems (including, but not limited to software code revisions) necessary to carry out its obligations under this Lease are Year 2000 Compliant. "Year 2000 Compliant" shall mean that neither performance nor functionality is affected by dates prior to, during and after the year 2000 as defined by the British Standards Institution committee BDD/1/ˉ3 (DISC PD2000-1). Specifically: (a) no value for the current date will cause any interruption to operation so that "roll-over" between all time demarcation (i.e. days,. months, years, centuries) will be performed correctly; (b) date-based functionality must behave consistently for dates prior to, during and after year 2000; (c) in all interfaces and data storage, the century in any date must be specified either explicitly or by unambiguous algorithms or inferencing rules; and (d) Year 2000 must be recognized as a leap year. Notwithstanding anything to the contrary in this Lease, Landlord agrees that the Year 2000 Compliant warranty set forth herein shall be in effect until December 31, 2000. Landlord further agrees to indemnify, protect, defend and hold Tenant harmless from all losses, claims, causes of action, suits, injuries and damage including, without limitation, reasonable attorneys' fees and costs relating to or resulting from a breach of the foregoing representation and warranty by Landlord.

## 27.9 Successors and Assigns

Subject to the provisions of Article 21, the covenants, conditions and agreements contained in this Lease shall be binding upon and shall inure to the benefit of Landlord and Tenant and their respective successors and assigns.

## 27.10 Interpretation

Wherever in this Lease provision is made for the approval or consent of any party hereto, then, unless expressly provided otherwise, such approval or consent shall not be unreasonably withheld, delayed or conditioned. All obligations of either party to indemnify the other shall survive the expiration or early termination of this Lease. This Lease constitutes the entire agreement between the parties with respect to the subject matter hereof and cannot be modified, supplemented, or amended except by an instrument in writing signed by the party to be charged. This Lease shall be interpreted and construed in accordance with the laws of the state in which the Premises are located. The waiver of an Event of Default by either of the parties shall not constitute a waiver of a subsequent Event of Default. In the event that any provision of this Lease is declared by any court or tribunal of competent jurisdiction to be illegal, such provision shall be null and void and shall be deemed deleted from this Lease and all remaining provision of this Lease shall

### 27.11 Dispute Expenses

If either party brings an action against the other to enforce or interpret the terms of this Lease or otherwise arising out of this Lease, the prevailing party in such action shall be entitled to its costs of suit and reasonable attorney's fees.

### 27.12 List of Exhibits

**Exhibit A** ......................Legal description of the Land
**Exhibit A-1** ..................Site Plan Designating the Premises and No Build Area
**Exhibit B** ......................Schedule of Landlord's and Tenant's Work
**Exhibit C** ......................Rules
**Exhibit D** ....................Prohibited Uses
**Exhibit D-1** ..................Exclusives
**Exhibit E** ......................Form of Non-Disturbance Agreement
**Exhibit F** ......................Form of Memorandum of Lease
**Exhibit G** ....................Form of Waiver of Application of Existing Exclusive

### 27.13 Right of First Refusal

(A)     Landlord represents that the lease (the "Adjacent Tenant Lease") for the balance of the Genovese Space as shown on the attached site plan and containing approximately 5,400 square feet (the "Expansion Space") currently being operated by Woodworkers Warehouse (the "Adjacent Tenant") expires on September 30, 2002 subject to two (2) unexercised options to extend the term. Landlord shall not extend, or grant new options to extend, the term of the Adjacent Tenant Lease.

(B)     Tenant shall have the right of first refusal to lease to Expansion Space upon the terms and conditions described herein. Landlord shall promptly notify the Tenant of the availability of the Expansion Space (the "Availability Notice"). The Expansion Space shall be deemed to "become available" upon the earlier to occur of (a) the expiration or early termination of the Adjacent Tenant Lease (subject only to the options to extend the term described above), or (b) the date on which the Adjacent Tenant abandons the Expansion Space, or (c) the date on which Landlord has the right to recapture the Expansion Space pursuant to a request to assign the Adjacent Tenant Lease or sublease the Expansion Space or otherwise. Tenant shall respond to the Availability Notice within 60 days after Tenant's receipt of the Availability Notice (the "Response Period"). If Tenant notifies Landlord that it declines to lease the Expansion Space or Tenant fails to notify Landlord of its response during the Response Period, Landlord may lease the Expansion Space to a third party.

(C)     If Tenant notifies Landlord that it desires to lease the Expansion Space pursuant to the right of first refusal, the Expansion Space shall be leased to Tenant when the expansion space becomes available upon all of the same terms and conditions contained in Tenant's existing lease except that

(1)     The term and Rent for the Expansion Space will commence on the earlier to occur of: (a) the date Tenant opens for business in the Expansion Space or (b) 120 days after all of the following requirements have been satisfied:

(a)     Physical possession of the Expansion Space has actually been delivered with Landlord's work completed;

(b)     Landlord and all governmental authorities have approved all of Tenant's plans and construction for the Expansion Space, including the signs and storefront;

(c)     Landlord has removed all asbestos and hazardous materials from the Expansion Space and support systems;

(d)     The first installment of the construction allowance was delivered when required;

Area for the original Premises, except seating and landscaping that at maturity will not exceed 4 feet in height;

(f)     If Tenant's 120-day construction period expires during a Dead Period, then the term and Rent will not begin, until the day after the end of the Dead Period.

(D)     The term of the Expansion Space shall be co-terminous with the term of Tenant's existing Premises. If the term of the Premises, including the Expansion Space, would expire within less than 3 years after the Expansion Space commencement date, then the term shall be extended until the date that is 3 years after the Expansion Space commencement date, and Rent during such extended period shall be the same rate per square foot as is payable under Tenant's existing lease.

(E)     Minimum Rent for the Expansion Space shall be the same rate per square foot as is payable under Tenant's existing lease.

(F)     Landlord will deliver the Expansion Space to Tenant within 3 months after the space becomes available in the condition described in Tenant's standard design and technical specifications attached hereto.

(G)     Landlord will pay Tenant a construction allowance in the amount of $189,000.00 ($35.00/s.f.). The construction allowance will be paid 75% 10 business days before Tenant commences construction; 15% on the date Tenant opens for business; and 10% within the later of 30 days after Tenant opens for business or 10 days after Tenant delivers to Landlord an executed lien waiver from Tenant's general contractor.

## 27.14  Exculpation

(A)     If Landlord shall fail to perform any covenant, term or condition of this Lease upon Landlord's part to be performed, and if as a consequence of such default Tenant shall recover a money judgment against Landlord, such judgment shall be satisfied only out of the proceeds of sale received upon execution of such judgment and levied thereon against the right, title and interest of Landlord in the Property and out of rents, issues or other income from such property receivable by Landlord after such judgment, or out of the consideration received by Landlord before or after the judgement from the sale or other disposition of all or any part of Landlord's right, title and interest in the Property. Nothing contained herein shall limit or affect any right that Tenant might otherwise have to obtain injunctive relief or other remedies or actions against Landlord which does not involve the personal liability of the Landlord. Notwithstanding the foregoing, the limitation of this Section 27.14 to claims for monetary damages shall not apply to or limit (1) any injunctive or other equitable, declaratory or other forms of relief to which Tenant may be entitled against Landlord which relief may include (A) the recovery of money damages awarded by the court as incident to such equitable or other relief, and (B) the expenditure of money by Landlord in order to comply with the equitable decree or other relief or reimburse Tenant for any loss on account of Landlord's failure or inability to comply therewith or cost of enforcement thereof, and (C) Tenant from obtaining an injunction to force Landlord to use insurance proceeds received by Landlord to perform Landlord's obligations under this Lease or (D) Tenant from obtaining an injunction or other appropriate relief to force Landlord to pay to Tenant insurance proceeds received by Landlord which by the terms of this Lease are to be paid to Tenant, or (2)Tenant from seeking recovery from any insurance policies maintained by Landlord in any suit or action in connection with enforcement or collection of amounts which may become owing or payable under or on account of insurance maintained by Landlord. If Landlord transfers it interest in this Lease, except as collateral security, then, upon such transfer, Landlord shall be released from all liability and obligations under this Lease accruing after such transfer, provided that the transferee assumes all such liability and obligations. Notwithstanding the foregoing, in no event shall any partner, shareholder, officer, member, employee or director of Landlord incur any personal liability for monetary damages under this Lease.

LANDLORD

Witness or Attest:

By _Joyce J. Dwyer_

SOUTHBURY 84 ASSOCIATES LIMITED
PARTNERSHIP,
a _Massachusetts limited partner_ship

By: Southbury Green Corporation, a Massachusetts
    corporation, its general partner

By _Robert C. Elder_
    Robert C. Elder

Title _President_


TENANT

Witness ~~or Attest:~~

By _J. Venturi_

THE GAP, INC.,
a Delaware corporation

By _____

**MICHAEL T. MC GUIRE**
Title **VICE PRESIDENT**
    **ASSOCIATE GENERAL COUNSEL**

## EXHIBIT A

All that certain tract of land with all improvements thereon, situated in the Town of Southbury, Connecticut and bounded and described as follows:

Beginning at a point on the southeasterly side of Main Street South where the same is intersected with the easterly property line of the Commuter Parking Lot property now or formerly of the State of Connecticut, said point is marked with a Connecticut Highway Department Monument; thence northeasterly along the southeasterly side of Main Street South, the following courses and distances: N.42°11'28" E. - 542.59 feet; thence on a curve to the left having a R = 2949.93 feet and a L = 399.29 feet, N.34°22'28" E. - 491.32 feet and N.34°26'48" E - 280.96 feet to the southerly side of Brown Road AKA Russell Road; thence southeasterly along the southerly side of Brown Road AKA Russell Road, the following courses and distances: S.63°25'36" E. - 53.72 feet, S. 82°15' E - 46.49 feet, S. 68°58'50" E. - 72.34 feet, S.63°25'36" E. - 360.98 feet, S.73°55'10" E. - 55.88 feet and S. 63°25'36" E. - 280.0 feet to Interstate I-84; thence southwesterly along the westerly side of Interstate I-84, the following courses and distances: S.54°43'47" W. - 97.73 feet, S.57°39'16" W. - 1629.81 feet, S. 64°43'02" W. - 202.85 feet and S. 55°59'38" W. - 204.00 feet to the easterly property line of the Commuter Parking Lot, property now or formerly of the State of Connecticut; thence northwesterly along land now or formerly of the State of Connecticut N.20°27'38" W. - 157.00 feet to the point or place of beginning.

Together with an easement from The Town of Southbury to Southbury 84 Associates Limited Partnership recorded July 26, 1996 in Volume 310 at Page 186 of the Southbury Land Records.

Together with a Drainage Easement Agreement by and between Robert A. Brinley, Jr. and Southbury 84 Associates Limited Partnership recorded July 31, 1996 in Volume 310 at page 515 of the Southbury Land Records, as amended by an Amendment to Drainage Easement Agreement by and between Robert A. Brinley, Jr. and Southbury 84 Associates Limited Partnership dated November , 1996 and recorded November 15, 1996 at 4:00 P.M. in Volume 313 at Page 1104 of the Southbury Land Records.



A. Landlord shall provide the following ("Landlord's Work"):

1. Existing water and sewer lines, upgraded if necessary to meet current code requirements; any modification thereto requested by Tenant shall be by Tenant at Tenant's expense.

2. Existing sprinkler system (e.g., sprinkler main, lateral grid and heads), upgraded if necessary to meet current code requirements; any modification thereto requested by Tenant shall be by Tenant at Tenant's expense. If no sprinkler system exists but is required by current code, the sprinkler main shall be installed by Landlord at Landlord's expense as required by NFPA 13 and current code in Tenant's preferred location; lateral grid and heads shall be installed by Tenant at Tenant's expense.

3. Concrete floor slab (or wood joists w/plywood subfloor), finished to a smooth, level surface, at a single elevation, free of any depressions (the cost to correct same shall be borne by Landlord).

4. Demising walls, studs and gypsum board finish to the deck of the adjacent tenant or corridor side, fire rated as required per current code.

5. Existing HVAC units; any demolition or modifications shall be by Tenant at Tenant's expense. New rooftop HVAC unit as identified on the Approved Tenant Plans.

6. Latent structural non-compliance conditions are the Landlord's responsibility. Additional structural work as required to support Tenant's HVAC units shall be by Tenant at Tenant's expense.

7. Insulation at the roof and exterior walls, upgraded if necessary to meet current code requirements.

8. Permanent (non-temporary) electrical service of size required by Tenant - 3 phase, 4 wire, 400 to 1,500 amps (for 120/208 voltage), or 200 to 650 amps (for 277/480 voltage) service (sized to the Premises in accordance with the attached table) with main disconnect switch and distribution panel with breakers at a location near the rear of the Premises or in a nearby electrical room.

9. Premises demolition work scope to include removal of all previous tenant's flooring material, interior partitions, furniture, fixtures, and supplies, including but not limited to all vaults, safes, customer service counters, food preparation and food storage equipment. Arrange and pay for disconnecting, removing and capping utility services within areas of demolition. Disconnect and stub-off. Broom sweep and clean existing concrete floor slab to accept tenants new finish flooring.

| | 1-2,999 sf | 3,000-4,999 sf | 5,000-6,999 sf | 7,000-9,999 sf | 10,000-12,499 sf | 12,500-14,999 sf | 15,000-17,499 sf | 17,500 sf and larger |
|---|---|---|---|---|---|---|---|---|
| ELECTRICAL: Required Amperage (based on 26 watts/s.f.) | 100A 200A | 150A 300A | 200A 400A | 300A 600A | 350A 800A | 450A 1000A | 550A 1200A | 650A 1500A |
| MECHANICAL: Required Tonnage | 10 Tons 15 Tons | 15 Tons 20 Tons | 20 Tons 25 Tons | 25 Tons 30 Tons | 35 Tons 40 Tons | 45 Tons 50 Tons | 55 Tons 60 Tons | 65 Tons 70 Tons |

Notes:
1. In the row for "ELECTRICAL: Required Amperage", the top number represents power supplied at 277/480 voltage and the bottom number represents power supplied at 120/208 voltage, all 3-phase, 4-wire.

2. In the row for "MECHANICAL: Required tonnage", the top number represents tonnage required for mall stores and the bottom number represents tonnage required for non-mall stores.

B.      Tenant shall provide the following ("Tenant's Work"):

All other work necessary to complete Tenant's desired improvements in the Premises to a degree sufficient to open for business. All Tenant's Work shall be performed by Tenant in accordance with Tenant's plans and specifications and in accordance with all applicable governmental regulations and codes. Tenant shall have no obligation to obtain a performance or payment bond in connection with its work in the Premises.

# EXHIBIT C

## RULES AND REGULATIONS

(a)     [Intentionally Deleted].

(b)     All garbage and refuse shall be kept inside the Demised Premises in the kind of container reasonably specified by Landlord, and shall be placed outside of the Demised Premises prepared for collection in the manner and at the places reasonably specified by Landlord.  Tenant shall pay the cost of removal of any of Tenant's refuse and garbage.

(c)     Except for the Dish described in Section 2.7 of the Lease and Tenant's roof-top HVAC equipment, if any, no radio, television aerial, satellite dish, or other similar device shall be erected on the roof or exterior walls of the Demised Premises without first obtaining in each instance Landlord's consent in writing, which consent shall not be unreasonably withheld or delayed.

(d)     No loud speakers, televisions, phonographs, radios, tape players or other similar devices shall be used in a manner so as to be heard outside of the Demised Premises when the doors are closed without prior written consent of Landlord.

(e)     Tenant shall keep the Demised Premises at a temperature sufficiently high to prevent freezing of water in pipes and fixtures.

(f)     The plumbing facilities shall not be used for any other purpose than that for which they are constructed; no foreign substance of any kind shall be thrown therein, and the expense of any breakage, stoppage, or damage resulting from a violation of this provision shall be borne by Tenant.

(g)     Upon Landlord's reasonable request, Tenant, at its expense, shall contract with an exterminator for termite and pest extermination services covering the Demised Premises, and shall deliver to Landlord proof of payment for such services.

(h)     Tenant shall not burn any trash or garbage of any kind in the Demised Premises or within the Shopping Center.

(i)     Tenant shall keep any display windows or signs in or on the Demised Premises well lighted during such hours and days that a majority of the stores keep lighted.

(j)     Tenant, shall at its sole cost and expense, keep the outside and inside surfaces of windows in the Demised Premises in a reasonably clean condition.

(k)     Tenant shall keep and maintain the Demised Premises including, without limitation, exterior and interior portions, of all windows, doors, and other glass in a reasonably neat and clean condition.

(l)     [Intentionally Deleted].

(m)     Tenant shall pay before delinquency all license or permit fees and charges of similar nature for the conduct of any business in the Demised Premises.

(n)     Tenant shall store and/or stock in the Demised Premises only such merchandise as Tenant is permitted to offer for sale in the Demised Premises pursuant to this Lease.

(o)     Tenant shall not conduct or permit any fire, bankruptcy, sidewalk sales, auction or "going out of business" sale (whether real or fictitious) in the Demised Premises.

(p)     Tenant shall not perform any act or carry on any practice which may physically damage, mar or deface the Demised Premises or any other part of the Shopping Center.

(q)     Tenant shall not use any forklift truck, tow truck or any other similar powered machine for handling freight in the Shopping Center except in such manner and in those areas in the Shopping Center as may be reasonably approved by Landlord.

(r)     Tenant shall not place a load on any floor in the interior delivery system, if any, or in the Demised Premises, or in any area of the Shopping Center, exceeding a floor load of two hundred (200) pounds per square foot.

Prohibited Uses. No part of the Shopping Center shall be used for any of the following:

      (i)     tanning, health, exercise or racquet club or spa, gymnasium, bowling alley, skating rink or other sports or recreational facility

      (ii)    school, library, reading room, or house of worship;

      (iii)   movie theatre, gallery, auditorium, meeting hall, hotel or motor inn;

      (iv)   massage parlor, adult bookstore, a so-called "head" shop, off-track betting or check cashing facility;

      (v)    car wash, automobile repair work or automotive service, automobile body shop, automobile, boat, trailer or truck leasing or sales, or laundromat;

      (vi)   tavern, bar, amusement park, carnival, banquet facility, dance hall, disco, nightclub, or other entertainment facility including video game room, pool hall, arcade, indoor children's recreational facility or other amusement center, other than games or the showing of videos as incidental to Tenant's primary business;

      (vii)   any manufacturing, warehouse or office use (except incidental to a retail operation);

      (viii)  funeral parlor, animal raising or storage, pawn shop, flea market or swap meet, junk yard;

      (ix)   drilling for and/or removal of subsurface substances, dumping, disposal, incineration or reduction of garbage or refuse, other thin in enclosed receptacles intended for such purposes; or

      (x)    any use which constitutes a public or private nuisance or produces objectionable noise or vibration heard or felt outside of the Premises when the doors are closed.

## Exhibit D-1

The following list is a summary of the currently existing exclusives granted to other tenants in the Shopping Center. The actual verbatim extracts of such exclusives is attached to this Exhibit D-1. In the event of a conflict or inconsistency between this summary and the actual verbatim extract attached to this Lease, the verbatim extract prevails.

### SOUTHBURY GREEN
### LISTING OF EXCLUSIVITY AGREEMENTS GRANTED TO TENANTS

| Tenant | Exclusive Agreements |
| --- | --- |
| Annie Sez | None Applicable |
| Blockbuster Videos | Not to sell or rent at Shopping Center or contiguous site, video cassettes, tapes, discs, games, excluding Staples and Grand Union and their replacements only if it is an Incidental Part of the new tenant's Use. |
| The Book Review | None |
| Down on Main Street | None |
| Dr. Wm. Filchak | None |
| Gayle O'Neil Antiques | None |
| GNC Corp. | None |
|  |  |
| Grand Union Co. | No other stores to be within 1,000 feet whose principal business is to sell food to be eaten away from premises. Does not restrict take-out restaurant or beer and wine stores. |
| Jasmine Szechuan | None |
| Laurel Party Store | None |
| Lindt Sprungli Inc. | Section 29. No other store whose primary purpose (more than 5%) is selling of premium candies in Shopping Center or immediately adjacent to land. |
| Petland Discounts | None |
| Staples, Inc. | Section 5.2.1 (Page 10). No other store within one mile selling office equipment (including computers), office furniture or office supplies, or the provision of copying or printing services. [Section 5.3: Other tenants can have same use if less than 5 % of such tenant's sales floor area.] |
| Starbucks Corp. | No other store to use any portion of the Property for the sale of (a) freshly ground or whole coffee beans, (b) espresso or espresso-based coffee drinks, or (c) gourmet, brand-identified brewed coffee. |
|  |  |

BLOCKBUSTER

D.   Landlord covenants and agrees that, during the Term, Tenant shall have the exclusive right (hereinafter, "Tenant's Exclusive Right") in the Shopping Center (or any property contiguous or adjacent to the Shopping Center), owned or leased by Landlord (or any affiliate of Landlord), or in which Landlord (or any affiliate of Landlord) has an interest, directly or indirectly, to sell, rent and/or distribute prerecorded video cassettes, video tapes, video discs, laser discs, video games (including without limitation CD-I), digital video discs or other video software (including CD-ROM) and/or any substitutes for, or items which are a technological evolution of, the foregoing items (hereinafter, collectively "Tenant's Exclusive Items").   This covenant and Tenant's Exclusive Right shall run with the land on which the Shopping Center is located and on any property contiguous or adjacent to the Shopping Center owned or leased by Landlord (or any affiliate of Landlord), or in which Landlord (or any affiliate of Landlord) has an interest, directly or indirectly, during the Term of this Lease.   Notwithstanding the foregoing, Tenant's Exclusive Right shall not apply to: (a) Staples, Inc. ("Staples"), and (b) Grand Union Company ("Grand Union"), (c)Tenants in the Shopping Center, pursuant to a written lease agreements with Landlord, executed on or before the date hereof,(d)nor to a future tenant leasing not less than 15,000 square feet of the space where Staples or Grand Union are currently located in each instance with respect to the sale (but not rental) of Tenant's Exclusive Items, provided that Tenant's Exclusive Items represent only an Incidental Part (as hereinafter defined) of such tenant's business.   "Incident Part" shall mean that not more than seven hundred and fifty (750) square feet of such tenant's total gross leasable area shall be used fore the display of such items.   Landlord agrees to enforce Tenant's Exclusive Right against other tenants in the Shopping Center using all reasonable legal means.   Notwithstanding the foregoing to the contrary, Staples may sell, but not rent, Tenant's Exclusive Items provided that Staples does not utilize more than 2,500 square feet for the display of such items.   In the event of a breach by Landlord under this Article 1.D., Tenant shall be entitled to injunctive relief as well as all other remedies available at law or in equity.

L _____

T _____

3



L.  Tenant shall store and/or stock in the Demised Premises only such merchandise as Tenant is permitted to offer for sale, rental or other distribution in the Demised Premises pursuant to this Lease.

M.  Tenant shall not conduct or permit any fire, bankruptcy, sidewalk sales, auction or "going out of business" sale (whether real or fictitious) in the Demised Premises.

N.  Tenant shall not perform any act or carry on any practice which may damage, mar or deface the Demised Premises or any other part of the Shopping Center.

O.  Tenant shall not use any forklift truck, tow truck or any other powered machine for handling freight in the Shopping Center except in such manner and in those areas in the Shopping Center as may be approved by Landlord in writing.

P.  Tenant shall not place a load on any floor in the interior delivery system, if any, or in the Demised Premises, or in any area of the Shopping Center, exceeding a floor load of two hundred (200) pounds per square foot.

### ARTICLE 59

### EXCULPATION

A.  Notwithstanding any provision of this Lease to the contrary, Tenant agrees to look solely to Landlord's interest in the Shopping Center and proceeds therefrom for recovery of any judgment from Landlord, it being understood that Landlord (or its representatives, agents, partners, shareholders, directors, employees, fiduciaries and officers) shall never be personally liable for any such judgment or for the payment of any monetary obligation.

B.  If this Lease is executed on behalf of Landlord by Robert Elder Associates or any other party as Agent for Landlord, then said Robert Elder Associates or other party is acting as Agent only and shall not in any event be held liable to Landlord or to Tenant for the fulfillment or non-fulfillment of any of the terms, covenants, or conditions of this Lease or for any action or proceedings that may be taken by Landlord against Tenant or by Tenant against Landlord, including but not limited to, any such action arising out of the performance or non-performance by Agent or any act pursuant to Landlord's direction.  Any waiver of Landlord's liability hereunder, including but not limited to, any waiver of subrogation rights, shall apply with equal force and effect to such Agent, except when such liability arises out of the negligent acts or omissions or willful misconduct of Agent.

IN WITNESS WHEREOF, the parties hereto have executed this Lease on the day and year first mentioned, the corporate party or parties by its or their proper officers thereto duly authorized.

WITNESSES:                        TENANT:

                                  BLOCKBUSTER VIDEOS, INC., a
                                  Texas corporation

_Bonnie Hudson_                   By: _____
_____                 Its: _____
                                       H. Scott Barrett
                                     President Domestic Video

                                                          L _____
                                                          2 _____

**WITNESSES:**

**LANDLORD:**

SOUTHBURY 84 ASSOCIATES LIMITED
PARTNERS, a Massachusetts
limited partnership

_Julia ? Miller_

_Elizabeth McDermott_

By: _Robert C. Elder_
Name: _Robert C. Elder_
Title: _General Partner_

**ACKNOWLEDGEMENT OF TENANT:**

STATE OF FLORIDA )
                                    ) SS.
COUNTY OF BROWARD )

On this _17_ day of _Dec_, 1996, before me, the
undersigned Notary Public in and for said County and State,
personally appeared _H. Scott Barrett_, as
_President Domestic Video_ for BLOCKBUSTER VIDEOS,
INC., a Texas corporation, who executed the foregoing instrument on
behalf of said corporation for the purposes therein expressed. He
is personally known to me and did not take an oath. In witness
whereof, I have hereunto set my hand and official seal the day and
year last above written.

(SEAL)
BONNIE H. HUDSON
COMMISSION # CC 547828
EXPIRES APR 18, 2000
BONDED THRU
ATLANTIC BONDING CO., INC.

_Bonnie Hudson_
Notary Public Signature
Printed/Typed Name: _____
My Commission Expires: _____
Commission Number:

**ACKNOWLEDGEMENT OF LANDLORD:**

STATE OF _Massachusetts_ )
                                              ) SS.
COUNTY OF _Suffolk_ )

On this _31st_ day of _December_, 1996, before me, the
undersigned Notary Public in and for said County and State,
personally appeared _Robert C. Elder_, as
_general partner_ of SOUTHBURY 84 ASSOCIATES, a
_MA limited partnership_, who executed the foregoing instrument on
behalf of said _partnership_ for the purposes therein expressed.
He/she is either ( ✓ ) personally known to me or ( ) has produced
_____ as identification, and ( ✓ ) did or ( ) did
not take an oath. In witness whereof, I have hereunto set my hand
and official seal the day and year last above written.

_Elizabeth McDermott_
Notary Public Signature
(SEAL)
Printed/Typed Name: _Elizabeth McDermott_
My Commission Expires: _1-9-2004_
Commission Number:

31

**3.02  Owner's Representations**  Grand Union has

agreed to sign this Lease Agreement because it relies on
assurances of the Owner that no other stores in the Shopping
Center or owned by the Owner within a ONE THOUSAND (1,000)
FOOT radius of the Shopping Center will sell food to be
eaten away from the premises, except as provided for herein,
and the trading areas analysis and profit projections made
by Grand Union in its decision to execute this Lease
Agreement is based on these representations of the Owner.
Therefore, it is agreed that, during the term of this Lease
and any extension of this Lease, the Owner shall not use,
nor permit to be used, any other stores in the Shopping
Center or any other property directly or indirectly owned or
controlled by the Owner, within a radius of ONE THOUSAND
(1,000) FEET of the Shopping Center, for a store where the
principal business is the sale of food intended to be eaten
off premises.  The foregoing restriction against the Owner
shall not prohibit the operation of a take-out type
restaurant or a take-out department within a restaurant nor
shall such restriction prohibit the sale of beer, wine or
other alcoholic beverages by a restaurant or package liquor
store, nor shall such restriction prohibit the sale of
confections, beverages, ice cream, milk, sherbets, candy,
popcorn, potato chips, pretzels, peanuts, pizza, bakery
products or the like by any occupant of the shopping center.
The foregoing restriction against the Owner shall not be
applicable to any after acquired property which consists of
a use that would be in violation thereof.

obligations as set forth above. Intending to be so bound,

the parties have executed this Lease Agreement.

WITNESS:                         OWNER:
                                 SOUTHBURY 84 ASSOCIATES
                                 LIMITED PARTNERSHIP

*Berger J. S. Warner*           *Robut C. Adey*
                                 General Partner

ATTEST/WITNESS:                  GRAND UNION:
                                 THE GRAND UNION COMPANY

*Assistant Secretary*            Vice President

43

D-1: Page 6 of 12

$L.nOT$

## EXCLUSIVE -

29. (a) Landlord covenants and agrees that, throughout the Term, it will not lease any space in the Shopping Center, or permit the use or occupancy of any such space, for the primary purpose of selling premium confections, candy and/or chocolates, except the Premises hereby demised. This restriction shall not apply to the current co-tenant(s) Grand Union and/or Genovese Drugs, however in no event shall Grand Union and/or Genovese Drugs establish a gourmet chocolate department within their store nor shall more than Five (5%) of the Gross Sales of either such co-tenant be derived from the sale of gourmet chocolate.

(b) Should Landlord or any of its officers, directors/trustees, individual members, or partners, as the case may be, hold or acquire any interest in any land immediately adjacent to the Shopping Center (whether accomplished directly by means of direct ownership, or indirectly through the use of leases, cross-easement agreements or similar techniques and documents), during the Term, Landlord warrants and agrees that (unless any premises on said land are already so leased and/or used) it shall not allow any of the space on such land to be leased or to be used for the primary purpose of selling premium confections candy and/or chocolates and/or candies.

(c) The term "primary purpose" as used in this Lease, shall mean a store which devotes more than Five (5%) percent of its retail selling space to the display and sale of premium confections, candy and/or chocolates.

(d) In the event that Landlord shall violate any of the provisions of this Article, Tenant, at any time thereafter, may, at its option, either (i) terminate the Lease upon giving to Landlord Ten (10) days' prior written notice of its election to do so, and upon the giving of such notice, the Lease shall cease and terminate on the date specified in such notice, and neither of the parties hereto shall be further obligated under the terms of this Lease, or (ii) upon written notice to Landlord, continue to operate in the Premises, but with Fixed Rent reduced to a level equal to Sixty (60%) percent of the Fixed Rent otherwise specified in Article 5 hereof. Tenant's Fixed Rent shall be so reduced until such time as such violation is permanently rectified.

(p) Tenant shall not place a load on any floor in the interior delivery system, if any, or in the Premises, or in any area of the Shopping Center, exceeding the floor load of the Premises.

**EXCULPATION -**

56. Notwithstanding any provision of this Lease to the contrary, Tenant agrees to look solely to Landlord's then interest in the Shopping Center, including all rents, profits, proceeds and insurance, for recovery of any judgment from Landlord, it being understood that Landlord (or its representatives, agents, partners, shareholders, directors, employees, fiduciaries and officers) shall never be personally liable for any such judgment or for the payment of any monetary obligation.

IN WITNESS WHEREOF, Landlord and Tenant have duly executed this Lease on the day and year first above written.

LANDLORD: **SOUTHBURY 84 ASSOCIATES LIMITED PARTNERSHIP**

Witness

BY: _Robert C. Elder_
General Partner

ATTEST:

TENANT: **LINDT & SPRUNGLI (USA) INC.**

_____
SECRETARY

BY: _____

29

acting upon any notice changing the payee and purporting to be signed by or on behalf of Landlord and believed by Tenant in good faith to be genuine. After one year from the issuance by Landlord of any bill or statement of charges to be paid by Tenant, whether for Base Rent, additional rent or otherwise, Landlord shall not increase the amount covered by such bill or statement.

Section 4.6. *Late Payment Charge.* In the event that Tenant fails to pay any amount of Base Rent due to Landlord within ten (10) days after notice to Tenant that payment is late, Tenant shall pay in addition to the amount due to Landlord a late payment charge in the amount of $250.00. The foregoing provision shall only apply to the second and subsequent instances in which a payment from Tenant is delinquent in any 12 consecutive month period during the Term hereof.

## Article V. Use

Section 5.1. *Permitted Use.* The Premises may be used for the sale and leasing of office equipment, office furniture and office supplies, and the provision of office related services, the sale of such other goods and provision of such other services as are or will be sold or provided at office product stores or in other stores of Tenant, for uses ancillary thereto, and for any other legal retail purpose not listed in Section 5.2.2. In the event the use of the Premises changes from the sale or lease of office equipment, office furniture or office supplies, and/or the provision of office related services, Tenant agrees that Tenant's primary use as changed shall not violate any exclusive use right existing on the date hereof and listed in **Exhibit F** which is then in effect and enforceable.

Section 5.2. *Exclusive, Prohibited and Restricted Uses.* Landlord covenants that, other than the Premises:

Section 5.2.1. *Exclusive Use.* No part of the Center nor any property within one mile of the Center owned by Landlord or by an entity under common control with Landlord shall be used for the sale or leasing of office equipment (including computers), office furniture or office supplies, or the provision of copying or printing services; and

Section 5.2.2. *Prohibited Uses.* No part of the Center shall be used for any of the following: (i) tanning, health, exercise or racquet club or spa, gymnasium, bowling alley, skating rink or other sports or recreational facility; (ii) school, library, reading room, or house of worship; (iii) movie theatre, gallery, auditorium, meeting hall, hotel or motor inn; (iv) massage parlor, adult bookstore, a so-called "head" shop, off-track betting or check cashing facility; (v) car wash, automobile repair work or automotive service, automobile body shop, automobile, boat, trailer or truck leasing or sales, or laundromat; (vi) tavern, bar, amusement park, carnival, banquet facility, dance hall, disco, nightclub, or other entertainment facility including video game room, pool hall, arcade, indoor children's recreational facility or other amusement center; (vii) any manufacturing, warehouse or office use (except incidental to a retail operation); (viii) funeral parlor, animal raising or storage, pawn shop, flea market or swap meet, junk yard; (ix) drilling for and/or removal of subsurface substances, dumping,

-10-

Staples

disposal, incineration or reduction of garbage or refuse, other than in enclosed receptacles intended for such purposes; or (x) any use which constitutes a public or private nuisance or produces objectionable noise or vibration; and

Section 5.2.3. *Restricted Uses*. No part of the Center within 300 feet of the Premises shall be leased to any tenant whose principal business includes seated restaurant service.

Section 5.3. *Covenants in General*. The covenants set forth in Section 5.2 shall run with the land comprising the Center. In the event of a breach of any such covenants, Tenant shall be entitled to injunctive relief and any other appropriate remedy. Notwithstanding the foregoing, Section 5.2 shall not prohibit any tenant under a lease existing on the date of this Lease from using space occupied by it for its present permitted use, nor prohibit any future tenant from selling and/or leasing office equipment, office furniture or office supplies or providing copying or printing services incidental to such tenant's primary business in no more than an aggregate of five percent of such tenant's sales floor area.

Section 5.4. *Obligation to Open*. Within a reasonable period of time after delivery of possession, Tenant agrees to fixture, stock and open for business within the Premises for one day as a "Staples The Office Superstore".

Section 5.5. *Recapture*. If Tenant ceases to operate a business on the Premises for more than 12 consecutive months (excluding any period the Premises are not being operated due to casualty, alterations, renovation or repairs), Landlord shall have the right to terminate this Lease and recapture the Premises. Within 60 days after the expiration of such 12 month period, Landlord may exercise its right of termination by giving Tenant notice thereof 90 days prior to the effective date of termination. If Landlord does not exercise the aforesaid termination right, and Tenant continues to not operate a business within the Premises for one or more additional 6 consecutive month periods, Landlord again shall have 60 days to exercise such right of termination after the expiration of each such 6 month period. Upon such termination, all further obligations of the parties shall cease, except for those accrued as of the termination date. Notwithstanding the foregoing, if Tenant in good faith commences operation of business in the Premises prior to the effective date of termination specified in Landlord's notice, such notice, and Landlord's election to terminate, shall be null and void and this Lease shall continue.

### Article VI. *Alterations; Signs*

Section 6.1. *Landlord's Alterations*. Landlord shall at its expense from time to time make any alterations, improvements or additions to the Premises, Building and Common Facilities that may be required on account of any existing or future laws or regulations (other than non-structural interior alterations, improvements or additions to the Premises solely required by the specific nature of Tenant's business). Tenant shall at its expense from time to time make any non-structural, interior alterations, improvements or additions to the Premises

-11-

APR 06 '00 11:31          D-1: Page 10 of 12

STARBUCKS

5.4 Exclusivity. Excluding Grand Union or any other anchor supermarket store of at least 48,000 sq. ft., Landlord shall not use or allow any other person or entity (except Tenant) to use any portion of the Property for the sale of (a) freshly ground or whole coffee beans, (b) espresso or espresso-based coffee drinks, or (c) gourmet, brand-identified brewed coffee. This restriction shall also apply to kiosks and carts.

Notwithstanding the foregoing, Landlord may permit: (1) any full service restaurant, serving a complete lunch and dinner menu to sell as an incidental part of its business brewed coffee or espresso-based drinks for on-premises consumption only; and (2) any bagel shop with the exception of Einstein's to sell as an incidental part of its business non-brand identified brewed coffee only.

D-1: Page 11 of 12

IN WITNESS WHEREOF, the parties have executed this Lease as of the date first above written.

LANDLORD:

SOUTHBURY 84 ASSOCIATES
LIMITED PARTNERSHIP
a Massachusetts limited partnership

By _____
Its _____

Landlord's Federal Tax Identification
Number: 04-3314089

TENANT:

STARBUCKS CORPORATION,
a Washington corporation

_____
Orin Smith
president and chief operating officer

28

D-1 : Page 12 of 12

STARBUCKS
© 1997 Starbucks Corporation REAL ESTATE

EXHIBIT E

## FORM OF NONDISTURBANCE AND ATTORNMENT AGREEMENT

FORM OF NON-DISTURBANCE AND ATTORNMENT AGREEMENT

**RECORDING REQUESTED BY**
**AND WHEN RECORDED, MAIL TO:**

c/o Thacher, Proffitt & Wood
Two World Trade Center
New York, NY 10048
Attn:   James L. Gregory, III, Esq.

### SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT

THIS SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT is made and entered into as of this _____ day of _____, 2000, by and among THE CHASE MANHATTAN BANK, a _____ ("Mortgagee"), THE GAP, INC., a Delaware corporation ("Tenant") and SOUTHBURY 84 ASSOCIATES LIMITED PARTNERSHIP, a Massachusetts limited partnership ("Landlord").

### RECITALS

A.     Mortgagee is the holder of a certain note (the "Note") and Mortgagee under a mortgage (the "Mortgage") dated _____ , in which Landlord is named as the mortgagor, which Mortgage recorded in the Official Records of_____ County, State of _____ . The Mortgage covers certain real property together with all appurtenances thereto and improvements thereon (the "Property") all as more particularly described in Exhibit A attached hereto and made a part hereof and which property is commonly known as The Southbury Green, in the Town of Southbury, County of New Haven, State of Connecticut.

B.     Landlord is the owner in fee simple of the Property and is the current obligor under the Note.

C.     By Lease dated _____ , 2000 (the "Lease"), Landlord leased to Tenant those certain premises (the "Premises") which constitutes or forms a portion of the Property covered by the Mortgage and commonly known as The Southbury Green, all as more particularly described in said Lease.

D.     The Lease is or may become (subject to this Agreement) subordinate in priority to the Mortgage.

E.     Tenant wishes to obtain from Mortgagee certain assurances that Tenant's possession of the Premises will not (subject to this Agreement) be disturbed by reason of the enforcement of the Mortgage covering the Premises or a foreclosure of the lien thereunder.

F.     Mortgagee is willing to provide such assurances to Tenant upon and subject to the terms and conditions of this Agreement.

### AGREEMENT

NOW, THEREFORE, in consideration of the above, the reciprocal promises hereinafter set forth, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto do mutually agree as follows:

1.     **Ratification.** The Lease now is or shall become upon the mutual execution of this Agreement subject and subordinate in all respects to the Mortgage and to all renewals, modifications and extensions thereof, subject to the terms and conditions of this Agreement. Tenant hereby affirms that the Lease is in full force and effect and that the Lease has not been modified or amended. Mortgagee acknowledges receipt of a copy of the Lease.

2.      **Landlord's Default.** From and after the date Tenant receives a fully executed copy of this Agreement, Tenant will not seek to terminate the Lease by reason of any act or omission of Landlord until Tenant shall have given written notice of such act or omission to Mortgagee (at Mortgagee's last address furnished to Tenant) and until a period of thirty (30) days shall have elapsed, Mortgagee shall have the right, but not the obligation, to remedy such act or omission, provided however that if the act or omission does not involve the payment of money from Landlord to Tenant and (i) is of such a nature that it could not be reasonably remedied within the thirty (30) day period aforesaid, or (ii) the nature of the act or omission or the requirements of local law require Mortgagee to appoint a receiver or to foreclose on or commence legal proceedings to recover possession of the Property in order to effect such remedy and such legal proceedings and consequent remedy cannot reasonably be achieved within said thirty (30) days, then Mortgagee shall have such further time as is reasonable under the circumstances to effect such remedy provided that Mortgagee shall notify Tenant, within ten (10) days after receipt of Tenant's notice, of Mortgagee's intention to effect such remedy and provided further that Mortgagee institutes immediate legal proceedings to appoint a receiver for the Property or to foreclose on or recover possession of the Property within said thirty (30) day period and thereafter prosecutes said proceedings and remedy with due diligence and continuity to completion.

3.      **Non-Disturbance and Attornment.** So long as Tenant is not in default under this Agreement or under the Lease (beyond any period given Tenant to cure such default) as would entitle Landlord to terminate the Lease or would cause, without any further action of Landlord, the termination of the Lease or would entitle Landlord to dispossess Tenant thereunder, Mortgagee will not disturb the peaceful and quiet possession or right of possession of the Premises by Tenant nor shall the Lease or its appurtenances be extinguished by reason of any Foreclosure (as hereinafter defined) or otherwise, nor join Tenant as a party in any action or proceeding brought pursuant to the Mortgage.

In the event that Mortgagee or its successors or assigns, as defined in Paragraph 7 hereof ("Successor Landlord") acquires the interest of Landlord or comes into the possession of or acquires title to the Premises (the "Succession") by reason of the foreclosure (judicial or non-judicial) or enforcement of the Mortgage (including a private power of sale) or the Note or obligations secured thereby or by a conveyance in lieu thereof or other conveyance or as a result of any other means (any or all of the foregoing hereinafter referred to as a "Foreclosure") and the conditions in the immediately preceding paragraph have been met, then the Lease and all appurtenances thereto shall remain in full force and effect and Tenant shall be bound to Successor Landlord under all of the provisions of the Lease for the balance of the term thereof (including any extensions or renewals thereof which may be effected in accordance with any options contained in the Lease) with the same force and effect as if Successor Landlord was Landlord under the Lease, and Tenant shall attorn to Successor Landlord as its landlord, such attornment to be effective and self operative, without the execution of any further instruments on the part of either of the parties hereto, immediately upon the Succession; and further, in such event, Successor Landlord shall be bound to Tenant under all of the provisions of the Lease, and Tenant shall, from and after such Succession, have the same remedies against Successor Landlord for the breach of any agreement contained in the Lease that Tenant might have had under the Lease against Landlord thereunder provided, however, that Successor Landlord shall not be:

(a)     liable for any act or omission of any prior landlord (including Landlord) which have accrued prior to the date on which Successor Landlord shall become the owner of the Premises; except for any ongoing default of which Tenant has notified the then holder of the Mortgage (whether or not such holder elected to cure or remedy such act or omission); or

(b)     subject to any offsets or defenses which Tenant might have against any prior landlord (including Landlord) unless Tenant shall have given notice (pursuant to Paragraph 2 hereof) of the state of facts or circumstances under which such offset or defense arose to the party who was the then holder of the Mortgage (whether or not such holder elected to cure or remedy such condition); or

(c)     bound by any rent or additional rent which Tenant might have paid to any prior landlord (including Landlord) more than thirty (30) days in advance of the due date under the Lease; or

(d)     liable for the return of any security deposit which Tenant may have paid to any prior landlord (including Landlord), unless such deposit is actually received by Successor Landlord; or

(e)     bound by any agreement terminating or amending or modifying the rent, term, commencement date or other material term of the Lease, or any voluntary surrender of the Premises, made without Successor Landlord's notice.

Tenant shall be under no obligation to pay rent to Mortgagee or Successor Landlord until Tenant receives written notice from Mortgagee or Successor Landlord stating that Mortgagee or Successor Landlord is entitled to receive the rents under the Lease directly from Tenant. Landlord, by its execution hereof, hereby authorizes Tenant to accept such direction from Mortgagee or Successor Landlord and to pay the rents directly to Mortgagee or Successor Landlord and waives all claims against Tenant for any sums so paid at Mortgagee's or Successor Landlord's direction. Tenant may conclusively rely upon any written notice Tenant receives from Mortgagee or Successor Landlord notwithstanding any claims by Landlord contesting the validity of any term or condition of such notice, including any default claimed by Mortgagee or Successor Landlord, and Tenant shall have no duty to inquire into the validity or appropriateness of any such notice.

In the event that any liability of Mortgagee or Successor Landlord does arise pursuant to this Agreement or the Lease, such liability shall be limited and restricted to Mortgagee's or Successor Landlord's interest in the Premises and shall in no event exceed such interest.

4.     **Intentionally Deleted.**

5.     **Agreement to Release Proceeds or Awards.**

(a)     Destruction. In the event of a casualty at the Premises, Mortgagee agrees to release its interest in any insurance proceeds, as described in Section 17.2 of the Lease, for the purpose of restoration, consistent with Tenant's rights and obligations under Article 19 of the Lease. Mortgagee acknowledges that it has no interest and waives any interest in Tenant's personal property, signs, or satellite dish installed at or about the Premises, or any insurance proceeds which are payable with respect thereto under either Landlord's or Tenant's policies.

(b)     Eminent Domain. In the event of a public taking or act of eminent domain, Mortgagee shall release its interest in that portion of the award to which Tenant is entitled pursuant to the Lease. Tenant may apply for an award from the condemning authority to compensate for Tenant's trade fixtures and leasehold or any other interest Tenant is entitled to pursuant to the Lease, provided that such award to Tenant does not reduce the award made to Landlord.

6.     **Tenant's Gross Sales Termination Right.** In the event Tenant exercises the termination right as set forth in Section 5.8 of the Lease, Tenant hereby agrees to deposit the termination fee in the amount of One Hundred and Fifty Thousand and 00/100 Dollars ($150,000) (the "Fee") with Mortgagee. Landlord by its execution hereof hereby authorizes Tenant to deposit the Fee with Mortgagee.

7.     **Notices.** All notices, demands, or requests, and responses thereto, required or permitted to be given pursuant to this Agreement shall be in writing and shall be sent postage prepaid by certified or registered mail return receipt requested, or may be forwarded by United States Express Mail Service, or by Federal Express or other private overnight delivery service or by telex or telegram (but not facsimile) provided that a receipt or proof of delivery thereof can be produced, addressed as follows:

To Mortgagee:          The Chase Manhattan Bank
                       c/o The Chase Commercial Mortgage Bank
                       Servicing Department
                       380 Madison Avenue
                       10th Floor
                       New York, NY 10017
                       Attention: Janice Smith

To Tenant: c/o The Gap, Inc.
    900 Cherry Avenue
    San Bruno, CA  94066
    Attention: Real Estate Law

To Landlord: Southbury 84 Associates Limited Partnership
    c/o Robert Elder Associates
    50 Milk Street
    Boston, MA  02109
    Attention: Mr. Robert C. Elder

with a copy given to the following party:

    Goodwin, Proctor & Hoar, L.L.P.
    Exchange Place
    Boston, MA  02109
    Attention: Elizabeth McDermott, Esq.

or to such other address as the parties may designate in writing. All such notices shall be deemed delivered when actually received or refused by the other party.

  8. **Successors and Assigns.** This Agreement shall be binding upon and inure to the benefit of the parties hereto, their respective personal representatives, successors and assigns it being understood that the obligations herein of Mortgagee shall extend to it in its capacity as mortgagee under the Mortgage and to its successors and assigns, including anyone who shall have succeeded to its interest or to Landlord's interest in the Premises or acquired possession thereof by Foreclosure or otherwise.

  IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

MORTGAGEE

WITNESS OR ATTEST:

    a _____

By: _____  By: _____

    Its: _____

TENANT

WITNESS OR ATTEST:  THE GAP, INC.
    a Delaware corporation

By: _____  By: _____

    Its: _____

**LANDLORD**

WITNESS OR ATTEST:

**SOUTHBURY 84 ASSOCIATES LIMITED PARTNERSHIP**
**a Massachusetts limited partnership**

By: _____

By: _____

Its: _____

## CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT

STATE OF CALIFORNIA   )
                         ) ss:
COUNTY OF SAN MATEO  )

On _____ , 2000, before me,_____, Notary Public, personally appeared _____, personally known to me to or proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

_____   (SEAL)
      Notary Public Signature

## EXHIBIT A

## Legal Description

The Gap, Inc.
Real Estate Law Department
900 Cherry Avenue
San Bruno, CA 94066
Attn: Stephanie Savides Andrew

---

## MEMORANDUM OF LEASE

This Memorandum of Lease is made and entered into as of this _____ day of
_____, 2000 by and between SOUTHBURY 84 ASSOCIATES LIMITED
PARTNERSHIP, a Massachusetts limited partnership ("Landlord"), and THE GAP, INC., a
Delaware corporation ("Tenant").

1. **Demise**. Pursuant to the Unrecorded Lease (as defined below), Landlord
leases to Tenant that certain store premises (the "Premises") containing approximately
9,628 square feet of gross leasable area and constituting a part of a retail shopping
center (the "Shopping Center") known as The Southbury Green, located at 775 Main Street
South, in the Town of Southbury, State of Connecticut. All land comprising the Shopping
Center is referred to as the "Property" and is legally described in **Exhibit A** attached hereto.

2. **Unrecorded Lease**. This Memorandum of Lease is made upon all of the
terms, covenants and conditions set forth in that certain unrecorded lease by and between
the parties hereto of even date herewith (the "Unrecorded Lease"), all of the terms and
conditions of which are made a part hereof as though fully set forth herein.

3. **Term/Commencement Date**. The term of this Memorandum of Lease and
the Unrecorded Lease shall commence in accordance with the terms of the Unrecorded
Lease, and shall expire on the last day of the month ten (10) years next following the
commencement date unless earlier terminated or extended in accordance with the
provisions of the Unrecorded Lease. Alternatively, the original term may expire on the
January 31st following the tenth (10th) anniversary of the commencement date, upon the
occurrence of certain conditions set forth in the Unrecorded Lease. In addition, Tenant is
granted two (2) option(s) to extend the original term for additional periods of five (5) years
each.

4. **Common Easement**. Tenant and the employees, agents, officers, directors,
licensees, contractors, subcontractors, successors and assigns (collectively, "Agents") of
Tenant and Tenant's customers and invitees shall have all rights appurtenant to the
Premises and a non-exclusive, irrevocable easement and right, in common with the other
occupants of the Shopping Center and with the public, for the purpose of access over and
across as well as the use of all areas for the common use of the occupants of the Shopping
Center, including, without limitation, the sidewalks, driveways and parking areas on the
Property (collectively, the "Common Areas"), which easement shall be appurtenant to the
Premises and shall run with the land.

(A)     Landlord covenants that, within the area identified as the "No Build
Area" on Exhibit A-1 to the Unrecorded Lease (a) there shall be no kiosk, pushcart, mobile
retail unit or other obstruction other than those shown on the site plan attached as Exhibit
A-1 (whether temporary or permanent) at any time commencing upon Delivery of
Possession until the expiration or early termination of this Lease, (b) the traffic pattern will

landscaping that at maturity will not exceed four (4) feet in height.

(B) With respect to the remainder of the Common Area outside of the No Build Area, Landlord shall not decrease the number of parking spaces below the number legally required, reduce in size or eliminate any driveways, or do any act which will materially interfere with access to or visibility of the Premises without Tenant's prior written consent, which consent shall not be unreasonably withheld.

5. **Use.** The Premises may be used for any lawful retail purpose. The foregoing is referred to herein as the "Permitted Use," except that the Premises may not be used for any of the uses listed on Exhibit D to the Unrecorded Lease, nor in violation of any of the Tenant exclusives attached as Exhibit D-1 pursuant to Section 12.2 of the Unrecorded Lease. Landlord shall take no action which would impair or limit Tenant's ability to conduct the Permitted Use.

6. **Restrictions.** (A) Landlord acknowledges that Tenant is entering into the Unrecorded Lease in reliance upon its ability to conduct the Permitted Use without any limitation or restriction ("Restriction") whatsoever by reason of any exclusive provision or contractual restriction or limitation granted to any other party whatsoever and wherever located, which applies or pertains to the Premises or Tenant's use therein, except as set forth on Exhibits D or D-1 to the Unrecorded Lease.

(B) Existing Restrictions. Landlord has furnished to Tenant the names of the parties and verbatim excerpts of all Restrictions existing as of the date of the Unrecorded Lease (an "existing Restriction"), regardless of such parties' use or business, which have been granted to any party and which are applicable to the Property. A schedule containing such existing Restrictions is attached to the Unrecorded Lease as Exhibit D-1.

(C) Future Restrictions. Any Restriction granted after the date of the Unrecorded Lease (a "future Restriction") that would in any way or manner pertain to the Permitted Use or the Premises shall have no application whatsoever to Tenant's use of the Premises, and all such future Restrictions shall expressly exclude, by specific reference, the Premises (as the same may be enlarged or decreased) during the Term (as the same may be extended pursuant to this Lease or otherwise). Landlord shall advise the beneficiaries of such future Restrictions of the provisions of Section 12.1 and this Section 12.2 of the Unrecorded Lease, and is hereby authorized to disclose such provisions verbatim to such parties.

7. **Interpretation.** Landlord and Tenant have entered into this Memorandum of Lease in order that third parties may have notice of the existence of the Unrecorded Lease and some of its specific provisions. This Memorandum of Lease is not a complete summary of the Unrecorded Lease. This Memorandum of Lease is not intended to amend, modify, or otherwise change the terms and conditions of the Unrecorded Lease between the parties hereto. Provisions in this Memorandum shall not be used in interpreting the provisions of the Unrecorded Lease. In the event of a conflict between this Memorandum and the Unrecorded Lease, the Unrecorded Lease shall control.

Landlord

SOUTHBURY 84 ASSOCIATES LIMITED
PARTNERSHIP
a Massachusetts limited partnership

By:_____

Its: _____

Tenant

THE GAP, INC.
a Delaware corporation

By:_____

Its: _____

STATE OF CALIFORNIA )
 ) ss:
COUNTY OF SAN MATEO )

On _____, before me, _____, Notary Public, personally appeared _____ personally known to me to or proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

_____ (SEAL)
Notary Public Signature

STATE OF _____ )
 ) ss:
COUNTY OF _____ )

On _____, before me, _____, Notary Public, personally appeared _____ personally known to me to or proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

_____ (SEAL)
Notary Public Signature

Stephanie Savides Andrew, Esq.
c/o The Gap, Inc.
Real Estate Law Department
900 Cherry Avenue
San Bruno, CA 94066


RE:     PROPOSED GAP STORE
        Southbury Green
        Southbury, Connecticut

Dear Ms. Andrew:

        Reference is made to that certain lease dated _____ (the "[insert name of tenant] _____ Lease") by and between _____, as Landlord, and _____ as Tenant, for certain premises located in Southbury Green shopping center in Southbury, Connecticut (the "Shopping Center").

        We have been advised that The Gap, Inc. is interested in leasing space (the "Gap Space") in the  Shopping Center.  Notwithstanding any exclusive use provision in the _____ Lease (including, without limitation, Section ____ thereof), _____ hereby consents to the display and sale within the Gap Space of up to _____ square feet in the aggregate of the following items: _____
_____.


                            Sincerely,


                            _____


                            By:_____
                            Name:_____
                            Title:_____

# FIRST AMENDMENT TO LEASE

THIS FIRST AMENDMENT TO LEASE ("Amendment") is made as of _____ *April 6* _____, 2010 (the "Effective Date"), by and between SOUTHBURY 84 ASSOCIATES LIMITED PARTNERSHIP, a Massachusetts limited partnership ("Landlord"), and THE GAP, INC., a Delaware corporation ("Tenant").

## RECITALS

A.   WHEREAS, Landlord and Tenant entered into that certain Shopping Center lease dated May 12, 2000, and that certain Letter Agreement dated January 4, 2005, as conditioned by Landlord's letter dated January 5, 2005 (collectively, the "Lease"), pursuant to which Landlord leased to Tenant approximately 9,628 square feet of retail space identified as on Exhibit A-1 of the Lease (the "Premises") in that certain retail shopping center commonly known as The Southbury Green (the "Shopping Center"), located at 775 Main Street South, in the Town of Southbury, State of Connecticut. All capitalized terms not otherwise defined herein shall have the same meaning ascribed to them in the Lease;

B.   WHEREAS, the current term of the Lease is currently set to expire on August 31, 2010; and

C.   WHEREAS, Landlord and Tenant desire to extend the Term of the Lease and to otherwise modify the Lease as set forth herein.

## AGREEMENT

NOW THEREFORE, in consideration of the mutual covenants herein and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Landlord and Tenant agree as follows:

1.   **Recitals**. The recitals of this Amendment are hereby incorporated as if fully set forth herein.

2.   **Extension of Term**. Effective as of the Effective Date, the Term of the Lease is hereby extended for five (5) years, commencing on September 1, 2010 and expiring on August 31, 2015 (the "Extended Term"), subject to extension or termination rights set forth in the Lease. During the Extended Term, minimum rent shall be as provided in paragraph 4 of this Amendment.

3.   **Option to Extend Term**. Section 5.7 of the Lease is hereby deleted in its entirety and replaced with the following:

> "Tenant shall have the option to extend the Term for one (1) additional period of five (5) Lease Years (September 1, 2015 through August 31, 2020), (the "First Option Period"), subject to Section 5.3 of the Lease and upon the same terms and conditions as are provided for the Extended Term, except that Minimum Rent shall be as provided in paragraph 4 of this Amendment."

4.   **Minimum Rent**. Effective September 1, 2010, the term "Minimum Rent" shall mean the following:

| Extended Term | Annual Minimum Rent | Annual Minimum Rent Per Square Foot |
|---|---|---|
| Extended Term (September 1, 2010 through August 31, 2013) | $192,560.00 | $20.00 psf |
| Extended Term September 1, 2013 through August 31, 2015 | $216,630.00 | $22.50 psf |

| First Option Period<br>September 1, 2015 through<br>August 31, 2020 | $232,997.60 | $24.20 psf |
|---|---|---|

5.    **Other Charges**.  Tenant shall continue to pay all Other Charges, subject to the terms and conditions set forth in the Lease, provided that Tenant shall not pay more than its proportionate share of Other Charges or otherwise subsidize any other occupant's proportionate share of Other Charges.

6.    **Notices**.  Effective as of the execution of this First Amendment to Lease, Section 24.6 is modified to reflect Lessee's current addresses for notices as follows:

To Lessee

For all notices,
including notices
of default, other
than invoices:                c/o The Gap, Inc.
                              2 Folsom Street
                              San Francisco, CA 94105
                              Attn: Real Estate Law, Store #2336

                              Fax: 415/427-0188
                              Telephone: 415/427-0225

For all invoices,
including copies of
notices of default
relating to
nonpayment of
amounts due to
Landlord:                     c/o The Gap, Inc.
                              40 First Plaza NW
                              Albuquerque, NM 87102
                              Attn: Real Estate Payables, Store #2336

                              Fax: 505/462-0256
                              Telephone: 505/462-0008

For all maintenance-
related issues,
including copies of
notices of default
relating to
maintenance:                  c/o The Gap, Inc.
                              850 Cherry Avenue
                              San Bruno, CA 94066
                              Attn: Facilities Services, Store #2336

                              Fax: 650/874-7797
                              Telephone: 800/241-2626

7. **Brokers**. Landlord and Tenant represent to each other that each has dealt with no broker in connection with this Amendment, and each party shall indemnify, defend and hold the other party harmless from and again any and all claims relating to a breach of the foregoing representation by the indemnifying party.

8. **Consent**. Landlord and Tenant represent and warrant to the other that no consents of third parties are necessary for the execution and performance of this Amendment (or that Landlord or Tenant has obtained all consents of third parties necessary for the execution and performance of this Amendment). Landlord shall defend, indemnify and save harmless Tenant from and against all losses, claims, demands, damages, liabilities, costs and attorneys' fees resulting from a breach of, or inaccuracy in, any of the representations and warranties set forth in this section. Tenant shall defend, indemnify and save harmless Landlord from and against all losses, claims, demands, damages, liabilities, costs and attorneys' fees resulting from a breach of, or inaccuracy in, any of the representations and warranties set forth in this section.

9. **No Waiver**. The parties agree that the terms and conditions set forth herein shall not alter, waiver or modify any rights, remedies or claims that the Landlord or Tenant now has or may hereafter have under or arising out of the Lease whether known or unknown and whether relating to periods of times before or after the date hereof, including, and without limitation, any rights, remedies or claims of Landlord or Tenant based in whole or in part on a default by the other party of its obligations under the Lease, or the non-satisfaction or failure of any requirement or condition under the Lease (such as, by way of example only, a co-tenancy or operating requirement failure).

10. **Miscellaneous**. Time is of the essence of this Amendment. This Amendment shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors. This Amendment shall be governed by and construed in accordance with the laws of the state in which the Premises is located. In the event of conflict or inconsistency between the provisions of this Amendment and any provisions of the Lease, the provisions of this Amendment shall govern. The parties may execute this Amendment in multiple counterparts, each of which constitutes an original, and all of which, collectively, constitute only one agreement. The signatures of all of the parties need not appear on the same counterpart, and delivery of an executed counterpart signature page by facsimile is as effective as executing and delivering this Amendment in the presence of the other Parties to this Amendment. This Amendment is effective upon delivery of one executed counterpart from each party to the other party. Any party delivering an executed counterpart of this Amendment by facsimile shall also deliver a manually executed counterpart of this Amendment, but the failure to do so does not affect the validity, enforceability, or binding effect of this Amendment. Except as set forth in this Amendment, all of the terms and conditions of the Lease shall continue in full force and effect throughout the term of the Lease.

*[SIGNATURES ON THE NEXT PAGE]*

IN WITNESS WHEREOF, the parties hereto have duly executed this Amendment as of the date first above written.

"LANDLORD"

SOUTHBURY 84 ASSOCIATES LIMITED PARTNERSHIP,
a Massachusetts limited partnership

By: Southbury Green Corp.

Its: General Partner

By: _____
Charles Favazzo

Its: Vice President


"TENANT"

THE GAP, INC.,
a Delaware corporation

By: _____

Its: _____
Paul R. Mohun
Senior Director
Associate General Counsel

## SECOND MODIFICATION TO LEASE AGREEMENT

**THIS SECOND MODIFICATION TO LEASE AGREEMENT** (this "Agreement") is made as of this ___ day of July, 2018, by and between **THE GAP, INC.**, a Delaware corporation, d/b/a The Gap (herein called "Tenant"), and **EQUITY ONE (NORTHEAST PORTFOLIO) LLC**, a Massachusetts limited liability company (herein called "Landlord")

## RECITALS

**WHEREAS**, Landlord (as a successor in interest to the original landlord, Southbury 84 Associates Limited Partnership) and Tenant are the current parties to that certain Shopping Center Lease dated May 12, 2000, which original lease document has since been amended, modified or assigned, as applicable, by the following documents First Amendment to Lease dated April 6, 2010 (collectively, the "Lease") covering certain premises currently known as unit or space number 40 and containing approximately 9,628 square feet (as more particularly described in the Lease, as affected hereby, and referred to in this Agreement as the "Premises") in the shopping center currently known as Southbury Green located in Southbury, Connecticut (as more particularly described in the Lease, as affected hereby, and referred to in this Agreement as the "Shopping Center"),

**WHEREAS**, the Lease is currently scheduled to expire on August 31, 2020, and

**WHEREAS**, Landlord and Tenant desire to amend the Lease as more fully described below

**NOW, THEREFORE**, in exchange for the mutual covenants and promises contained herein and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows

1      **Recitals; Defined Terms.** The above Recitals are hereby confirmed as true and correct and are reaffirmed herein Capitalized terms used herein but not defined herein shall have the meanings given to such terms in the Lease For purposes hereof and to the extent used herein, the terms "Tenant's Proportionate Share", "Common Area Costs", "Taxes", "Insurance" or "Term" shall have the meanings given to such terms, similar terms or concepts as more particularly described in the Lease, as affected hereby

    (I)     **New Landlord and Tenant Notice Address.** Effective as of the date of this Agreement, any notice address(es) set forth in the Lease for Landlord and Tenant under the Lease are hereby deleted and replaced with the following notice address(es) to which any notice, demand, request, approval, consent or other instrument which may be or is required to be given to Landlord and Tenant thereunder shall be delivered

To Landlord

            c/o Regency Centers Corporation
            One Independent Drive, Suite 114
            Jacksonville, Florida 32202-5019
            Attention Lease Administration

            with a copy to
            c/o Regency Centers Corporation
            One Independent Drive, Suite 114
            Jacksonville, Florida 32202-5019
            Attention Legal Department

            with a copy to
             c/o Regency Centers Corporation
             28 Church Lane, Suite 200
            Westport, Connecticut 06880

To Tenant

            For all notices,
            including notices
            of default, other
            than invoices         c/o The Gap, Inc
                                2 Folsom Street
                                San Francisco, CA 94105
                                Attn Real Estate Law, Store #2336

                                Fax 415/427-0188
                                Telephone 415/427-0225

          For all invoices,
          including copies of
          notices of default
          relating to

294211 3

INITIAL HERE
Tenant      _____
Landlord      _____

nonpayment of
amounts due to
Landlord

c/o The Gap, Inc
4400 Masthead Street NE, Suite 300
Albuquerque, NM 87109-4684
Attn Real Estate Payables, Store #2336

Fax 505/462-0256
Telephone 866/411-2772

For all maintenance-
related issues,
including copies of
notices of default
relating to
maintenance

c/o The Gap, Inc
4400 Masthead Street NE, Suite 300
Albuquerque, NM 87109-4684
Attn Store Maintenance, Store #2336

Fax 415/427-3040
Telephone 800/241-2626

(II)  **Key Stores.**  Notwithstanding anything to the contrary contained in the Lease, effective as of January 22, 2018, the tenant trading as "Staples" closed for business in the Shopping Center  As a result of the Operating Requirements not being satisfied as of January 22, 2018, Tenant has been entitled to pay Alternate Rent as of such date  Landlord has executed a lease agreement with HomeGoods, Inc ("HomeGoods"), for that space  Wherever the word "Staples" appears in the Lease shall hereby be replaced with the word "HomeGoods" and wherever the numbers and symbols "24,000" appear in the Lease in connection with HomeGoods shall hereby be replaced with the numbers and symbols "19,474"  Accordingly, upon the date HomeGoods opens for business in the Shopping Center, which is anticipated to occur July 29, 2018, the Operating Requirements shall be deemed satisfied and Tenant shall commence paying full Minimum Rent and Other Charges, computed in the manner set forth in the Lease

2  **No Waiver.**  The parties agree that the terms and conditions set forth in this Agreement shall not alter, waive or modify any rights, remedies or claims that Landlord or Tenant now has or may hereafter have under or arising out of the Lease whether known or unknown and whether relating to periods of time before or after the date of this Agreement, including, without limitation, any rights, remedies or claims of Landlord or Tenant based in whole or in part on a default by the other party of its obligations under the Lease, or the non-satisfaction or failure of any requirement or condition under the Lease

3  **Entire Agreement; Miscellaneous.**  This Agreement sets forth the entire understanding and agreement of the parties hereto in relation to the subject matter hereof and supersedes any prior negotiations and agreements among the parties relative to such subject matter  The parties hereto hereby acknowledge that the Lease as affected by this Agreement is in full force and effect and, as hereby affected, is ratified and confirmed  In the event of any conflict between the terms and conditions of this Agreement and the Lease, this Agreement shall control  This Agreement shall be effective only when it is signed by all parties hereto   This Agreement will be binding upon and inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors and assigns

4  **Authority.**  Each individual executing this Agreement on behalf of a corporation, limited liability company, partnership or other business entity represents that he or she is duly authorized to execute and deliver this Agreement on behalf of such entity and agrees to deliver evidence of his or her authority to Landlord promptly upon request

5  **Counterparts.**  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original and all of which together constitute a fully executed agreement even though all signatories do not appear on the same document

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the day and year first above written

INITIAL HERE
Tenant        ____
Landlord      ____

**TENANT:**

**THE GAP, INC.,**
a Delaware corporation

By _____

Print Name     Matthew Irwin
    Senior Director

Its _____
Position/Title     Associate General Counsel

Attest _____

Print Name _____
    Alice Chuang

Its _____
Position/Title     Senior Counsel

Tax ID # ___94 - 1697231___

Witness *Elaine Tse*
Print Name Elaine Tse

Witness *Karen Reed*
Print Name Karen Reed

**LANDLORD:**

**EQUITY ONE (NORTHEAST PORTFOLIO) LLC,**
a Massachusetts limited liability company

By   Regency Centers, L P ,
    a Delaware limited partnership
    Its   Managing Member

      By   Regency Centers Corporation,
        a Florida corporation
        Its   General Partner

By _____

Print Name     Jack deVilliers
    VP - Investments

Its _____
Position/Title

Witness _____
Print Name

Witness _____
Print Name

INITIAL HERE
Tenant     _____
Landlord     _____

## THIRD MODIFICATION TO LEASE AGREEMENT

THIS THIRD MODIFICATION TO LEASE AGREEMENT (this "Agreement" or sometimes referred to herein as this "Modification") is made as of this _3(_ day of ___*DfCem hv*___, 20[*01*] by and between **THE GAP, INC.**, a Delaware corporation, d/b/a The Gap (herein called "Tenant"), and **EQUITY ONE (NORTHEAST PORTFOLIO) LLC**, a Massachusetts limited liability company (herein called "Landlord").

### RECITALS

**WHEREAS**, Landlord, as successor-in-interest to Southbury 84 Associates Limited Partnership, and Tenant are the current parties to that certain Shopping Center Lease dated May 12, 2000 ("Original Lease"), as amended by that certain First Amendment to Lease dated April 6, 2010 ("First Amendment"), and that certain Second Modification to Lease Agreement dated July 17, 2018 ("Second Amendment") (collectively, the "Lease") covering certain premises currently known as unit or space number 40 and containing approximately 9,628 square feet (as more particularly described in the Lease, as affected hereby, and referred to in this Agreement as the "Premises") in the shopping center currently known as Southbury Green located in Southbury, Connecticut (as more particularly described in the Lease, as affected hereby, and referred to in this Agreement as the "Shopping Center")

**WHEREAS**, the parties hereto wish to extend the Term of the Lease and modify and/or amend certain terms of the Lease as more specifically described herein

**NOW, THEREFORE**, in exchange for the mutual covenants and promises contained herein and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows

1      Recitals. Defined Terms   The above Recitals are hereby confirmed as true and correct and are reaffirmed herein Capitalized terms used herein but not defined herein shall have the meanings given to such terms in the Lease. For purposes hereof and to the extent used herein, the terms "Tenant's Proportionate Share", "CAM Charge", "Taxes", "Insurance" or "Term" shall have the meanings given to such terms, similar terms or concepts as more particularly described in the Lease, as affected hereby

2      Modifications and/or Amendments  Effective as of the date of this Agreement, the Lease is hereby modified and/or amended to include the terms and conditions set forth in this paragraph and its subparagraphs, articles and sections below  For purposes of such modifications and/or amendments, the following terms or phrases shall have the following meanings (i) "this Agreement" or "this Modification" shall mean this Agreement, and (ii) "this Lease" or "the Lease" shall mean the Lease and as applicable, as the same may be further amended, modified, extended and/or renewed pursuant to this Agreement

     (I)    Term  The Term of the Lease is set to expire on August 31, 2020 However, the Term of the Lease is hereby extended for a twenty-nine (29) full calendar month period commencing on September 1, 2020 and expiring on January 31, 2023 (the "Second Extended Term") on the same terms and conditions set forth in the Lease (as affected by this Agreement) There are no options to extend the Term beyond the Second Extended Term, except for any new option(s) to extend otherwise specifically granted to Tenant in this Agreement, if any

     (II)    Minimum Rent  During the Second Extended Term, minimum rent (as more particularly described and sometimes referred to as Minimum Rent in the Lease, as affected hereby, and referred to in this Agreement as "Minimum Rent") shall be as follows (plus applicable sales tax, if any)

| Months | Minimum Rent (Monthly) | Minimum Rent (Per Sq. ft. of the Premises per annum) | Minimum Rent (Annual) |
|---|---|---|---|
| 9/1/20 - 1/31/23 | $15,416 67 | $19 21 | $185,000 00 |

Minimum Rent shall be prorated for any partial month Notwithstanding anything to the contrary contained elsewhere in the Lease, it is the intention of the parties that the Minimum Rent set forth above includes taxes, common area maintenance charges, promotional fund fees, and insurance for the Shopping Center and the same will not be billed in addition to the Minimum Rent Landlord, in Landlord's sole discretion, shall have the right to apportion any part (or none) of the Minimum Rent, as Landlord deems advisable, toward Tenant's share of taxes, common area maintenance charges, promotional fund fees, and insurance for the Shopping Center

     (III)    Percentage Rent

**PERCENTAGE RENT.**

Effective as of the first day of the Second Extended Term, and in addition to Minimum Rent, Tenant agrees to pay to Landlord as percentage rent ("Percentage Rent") for each lease year (as more particularly described in the Lease, as affected hereby, and referred to in this Agreement as "Lease Year") of the Term an amount equal to the stated percentage times the amount of Gross Sales made during the stated Lease

1

INITIAL HERE

Tenant
Landlord

Year in excess of the stated dollar amount (the "Lease Year Breakpoint") as more particularly set forth below

| Period | Percentage | Breakpoint |
|--------|-----------|-----------|
| 9/1/20 – 1/31/2023 | 10 00% | $1,850,000 00 |

If the first or last Lease Year is less than twelve (12) months, then the Lease Year Breakpoint for such Lease Year shall be prorated based upon a twelve (12) month Lease Year  Notwithstanding anything contained in the Lease to the contrary, if the number of square feet in the Premises is reduced at any time during the Term due to casualty, condemnation or other cause, then the Lease Year Breakpoint for the particular Lease Year and for each subsequent Lease Year during the Term shall be equitably reduced as reasonably determined by Landlord

### ANNUAL PAYMENT OF PERCENTAGE RENT; YEAR END ADJUSTMENT.

(a)     Tenant shall furnish to Landlord within sixty (60) days after the end of each Lease Year during the Term a complete statement, certified by Tenant (or a responsible officer thereof if Tenant is a corporation, limited liability company or other business entity), of the amount of Gross Sales made from the Premises during said Lease Year  Tenant shall pay any Percentage Rent then due to Landlord simultaneously with each said annual statement

### ADDITIONAL AUDIT RIGHTS.

Tenant shall keep safe and intact at Tenant's offices in the United States all of the records, books, accounts and other data which are regularly kept by Tenant in the ordinary course of its business to establish Tenant's Gross Sales  Landlord or its designated agent shall have the right at its own cost and expense to audit and/or inspect Tenant's records, books, accounts and other data relating to Tenant's Gross Sales at the Premises for any Lease Year  Landlord shall give Tenant not less than ten (10) days' written notice of its intention to conduct any such audit  If such audit discloses that the amount paid by Tenant as Percentage Rent for the Lease Years under consideration has been understated, Tenant shall pay to Landlord the deficiency  If, as a result of such audit, it is determined that the amount reported by Tenant as Gross Sales for the Lease Years under consideration has been understated by more than three percent (3%), then, in addition to paying to Landlord the deficiency, Tenant shall also pay the reasonable costs incurred by Landlord for such audit

(IV)     Landlord's Insurance   Notwithstanding anything to the contrary contained in the Lease, Landlord may, at Landlord's option, elect to self-insure all or any part of any insurance coverages carried by Landlord with respect to the Shopping Center so long as the coverage required under the Lease is not reduced or diminished

(V)     Waiver of Jury Trial   EACH PARTY HERETO HEREBY WAIVES ITS RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THE LEASE, OR THE SUBJECT MATTER HEREOF OR THEREOF   THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL-ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THE LEASE, INCLUDING, WITHOUT LIMITATION, CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS   THIS SECTION HAS BEEN FULLY DISCUSSED BY EACH OF THE PARTIES HERETO AND THESE PROVISIONS WILL NOT BE SUBJECT TO ANY EXCEPTIONS  EACH PARTY HERETO HEREBY FURTHER WARRANTS AND REPRESENTS THAT SUCH PARTY HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL, AND THAT SUCH PARTY KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL

(VI)     Right of First Refusal   Effective as of the date of this Agreement, Section 27 13 of the Original Lease is hereby deleted in its entirety and is of no further force and effect

3.     Anti-Terrorism and Money Laundering Representation and Indemnification   Tenant certifies that (i) neither it nor its officers, directors or controlling owners is acting, directly or indirectly, for or on behalf of any person, group, entity, or nation named by any Executive Order, the United States Department of Justice, or the United States Treasury Department as a terrorist, "Specially Designated National or Blocked Person," or other banned or blocked person, entity, nation, or transaction pursuant to any law, order, rule or regulation that is enforced or administered by the Office of Foreign Assets Control ("SDN"), (ii) neither it nor its officers, directors or controlling owners is engaged in this transaction, directly or indirectly on behalf of, or instigating or facilitating this transaction, directly or indirectly on behalf of, any such person, group, entity or nation, and (iii) neither it nor its officers, directors or controlling owners is in violation of Presidential Executive Order 13224, the USA Patriot Act, the Bank Secrecy Act, the Money Laundering Control Act or any regulations promulgated pursuant thereto  Tenant hereby agrees to defend, indemnify, and hold harmless Landlord from and against any and all claims, damages, losses, risks, liabilities and expenses (including attorneys' fees and costs) arising from or related to any breach of the foregoing certification  Should Tenant, during the Term, be designated an SDN, Landlord may, at its sole option, terminate the Lease

2

REGENCY
CENTERS

INITIAL HERE

Tenant
Landlord

4       No Waiver of Claims   The parties agree that the terms and conditions set forth in this Amendment shall not alter, waive or modify any rights, remedies or claims that Landlord or Tenant now has or may hereafter have under or arising out of the Lease whether known or unknown and whether relating to periods of time before or after the date of this Amendment, including, without limitation, any rights, remedies or claims of Landlord or Tenant based in whole or in part on a default by the other party of its obligations under the Lease, or the non-satisfaction or failure of any requirement or condition under the Lease (such as, by way of example only, a co-tenancy or operating requirement failure)

5       Miscellaneous   The parties hereto hereby acknowledge that the Lease as affected by this Agreement is in full force and effect and, as hereby affected, is ratified and confirmed   By entering into this Agreement, Landlord in no way waives any rights and remedies available to it with respect to any existing or future defaults under the Lease, all of which rights and remedies Landlord hereby specifically reserves   Landlord shall have the discretion to direct how payments under the Lease (as affected hereby) are applied to any then due amounts on the account for the Premises   In the event of any conflict between the terms and conditions of this Agreement and the Lease, this Agreement shall control   This Agreement shall be effective only when it is signed by all parties hereto   A party's submission of a signed Agreement for review by Landlord does not give any such party any interest, right or option

6       Authority   Each individual executing this Agreement on behalf of a corporation, limited liability company, partnership or other business entity represents that he or she is duly authorized to execute and deliver this Agreement on behalf of such entity and agrees to deliver evidence of his or her authority to Landlord promptly upon request

7       Counterparts   This Agreement may be executed in any number of counterparts, each of which shall be deemed an original and all of which together constitute a fully executed agreement even though all signatories do not appear on the same document   Delivery of an executed counterpart of this Agreement by facsimile or as an attachment to an email shall be equally effective as delivery of a mutually executed counterpart of this Agreement   This Agreement may be signed electronically   Facsimile or e-mail transmittal of original handwritten signatures and electronic signatures shall all be considered to have the same legal effect as execution and delivery of the original printed document with handwritten signatures and shall be treated in all manner and respects as the original printed document with handwritten signatures

[remainder of page intentionally left blank]

3

INITIAL HERE

Tenant
Landlord

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement under seal as of the day and year first above written

**TENANT:**

**THE GAP, INC.,**
a Delaware corporation

By _____

Witness *Kate Evans*
Print Name *Kate Evans*

Print Name:
**Matthew Irwin**
**Senior Director**

Its _____
**Associate General Counsel**
Position/Title

Witness *Elaine Tse*
Print Name *Elaine Tse*

Attest _____
*John A Caldwell*
Print Name *John A Caldwell*

Its *Contract Attorney*
Position/Title

Tax ID # *94-1697231*

**LANDLORD:**

**EQUITY ONE (NORTHEAST PORTFOLIO) LLC,**
a Massachusetts limited liability company

By  Regency Centers, L P ,
    a Delaware limited partnership
    Its  Managing Member

    By  Regency Centers Corporation,
        a Florida corporation
        Its  General Partner

Witness *Sean McEwen*
Print Name

        By _____
           **Jack deVilliers**
          Print Name **VP - Investments**

Witness *Stephen Um*
Print Name

        Its _____
          Position/Title

4

INITIAL HERE

Tenant 
Landlord _____